COMMUNITY NUTRITION INSTITUTE
et al., Plaintiffs,

v.

Earl L. BUTZ, Secretary of
Agriculture, Defendant.

Civ. A. No. 76–1585.

United States District Court,
District of Columbia.

Sept. 10, 1976.

Daniel R. Efroymson, Eaton, Stein & Efroymson, Washington, D. C., for plaintiffs.

Vincent B. Terlep, Jr., U. S. Dept. of Justice, Robert G. Hibbert, U. S. Dept. of Agriculture, Washington, D. C., for defendant.

## MEMORANDUM AND ORDER

BRYANT, District Judge.

This matter is now before the Court on plaintiffs' Motion For Preliminary Injunction, and defendant's opposition thereto. In this action plaintiffs, various consumer-oriented public interest groups, state officials, and a Member of Congress, challenge the action of the Secretary of Agriculture in promulgating, without notice, public participation, or thirty-day delayed effective date, a new regulation which for the first time gives the formal sanction of the Department to the use of Mechanically Deboned Meat (MDM) as a constituent element of certain food products under his regulatory supervision. The regulation, 9 C.F.R. § 319.3, was published at 41 *Federal Register* 17535 on April 27, 1976, to be effective immediately.

Mechanically deboned meat is produced by pulverizing bones from which most meat has been removed by traditional hand means, then centrifuging the resultant mash through a fine sieve. The technology for producing MDM from red meat without undue bone fragments or metal slivers has only recently been developed. The machinery currently in use allows bone particles in MDM of a diameter of approximately .018 inches. The Department has been involved in the observation and supervision of such developing technology for about fifteen years, and in late 1974 felt that MDM technology had advanced to the point where it could produce acceptable red meat MDM for American consumption. Consequently, in November of 1974 it issued a bulletin to its inspectors, state officials, and meat producers specifying that MDM could thereafter be produced and sold in the United States under certain conditions and with certain specifications. Those specifications were subsequently revised, and on April 27th of this year the Department issued the instant regulation further modifying those specifications and defining the permissible uses of MDM. The regulation is issued as one of the "definitions and standards of identity or composition" for meat products pursuant to 21 U.S.C. § 607(c), part of the Federal Meat Inspection Act. Plaintiffs challenge the regulation as defective under the Administrative Procedure Act and as in substantive conflict with the Federal Meat Inspection Act, as amended, 21 U.S.C. §§ 601 *et seq.* Plaintiffs' basic claim in this regard is that the regulation permits the sale of adulterated and misbranded meat, contrary to the provisions of the Act. The Court entered a temporary restraining order against the operation of the regulation on September 1, 1976. Oral argument on the motion for preliminary injunction was held on September 9, 1976.

The standards for the issuance of a preliminary injunction are generally those found in *Virginia Petroleum Jobbers Assn.*

754

*v. F.P.C.,* 104 U.S.App.D.C. 106, 259 F.2d 921 (1958). However when federal statutes have been violated, it has long been the rule that a court need not inquire into the traditional requirements for equitable relief. See, *United States v. City and County of San Francisco,* 310 U.S. 16, 60 S.Ct. 749, 84 L.Ed. 1050 (1940); *Atchison, Topeka, and Santa Fe Railway Co. v. Callaway,* 382 F.Supp. 610, 623 (D.D.C., 1974); *Lathan v. Volpe,* 455 F.2d 1111, 1116 (C.A.9, 1971). In any event, the facts of this case do satisfy the traditional requisites for the issuance of a preliminary injunction.

## I. SUCCESS ON THE MERITS

A. The Administrative Procedure Act Claims

■■■ The Secretary relies principally upon the "interpretative rule" exception to the requirements of 5 U.S.C. §§ 553(b), (c), and (d), and secondarily on the "good cause" exception to those requirements, to excuse his failure to comply with the ordinary procedures of the APA. He argues that this regulation is merely an interpretative rule which states his opinion as to what does and does not constitute adulteration and misbranding, and has no force of law. These arguments are without merit. The Department has been deeply involved in the regulation of MDM for many years, and both it and the meat packing industry consider this regulation as an explicit limitation on the composition and uses of the product. When a regulatory agency exercises its statutory authority to set standards and prescribe conduct, as is the case here, it must do so in accordance with the substantive rulemaking provisions of the APA. This regulation is a "definition and standard of identity or composition", 21 U.S.C. § 607(c), and is civilly and criminally enforceable; indeed, the Department explicitly states that one of its purposes in promulgating the regulation is to have an enforceable limit on MDM content. In these circumstances, no serious contention can be made that the rule is within the exception to the rulemaking requirements of the APA as merely "interpretative". For like rea-

sons, the Secretary's reliance on *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944) is wholly misplaced; the relationship between the situation at issue there and the present case is at best remote.

■■■ The "good cause" exemption to the rulemaking requirements is also inapplicable to the circumstances of this case. The Secretary specifies as the good cause for ignoring those requirements the need to obtain information and data for use in connection with the proposed rulemaking proceedings, related to the production of MDM and other matters, initiated at the same time as the promulgation of this "interim" rule. However when a health-related standard such as this is involved, the good cause exemption may not be used to circumvent the legal requirements designed to protect the public by ensuring that interested persons will have the opportunity to bring to the agency's attention all relevant aspects of the proposed action and thereby enhance the quality of agency decisions. If the Department wanted information to use in its rulemaking process, it could have simply required the industry to supply that information as a condition precedent to the approval of MDM under the Federal Meat Inspection Act as safe. The law requires the Secretary to determine that meat is not adulterated or to condemn that meat; the fact that he may not have the data necessary to make a determination of safety means that he cannot rule that meat is not adulterated, not that he may suspend the rulemaking requirements of the APA and expose the public to uncertain hazards while he collects information necessary to make those decisions. Indeed, the Secretary states in the preamble to the interim rule that the technology has "not been used sufficiently in this country to decide upon limits for protein, fat, and bone quantity, and protein quality that are appropriate and acceptable in various formulated products." 41 *Fed.Reg.* 17535. Far from being good cause for circumventing the normal rulemaking requirements, this constitutes a compelling reason to utilize those procedures before subjecting the public to any possible hazard. Accordingly, the Court

holds that the promulgation of this regulation was in violation of the Administrative Procedure Act, and that in this regard plaintiffs are likely to succeed on the merits of their contentions.

## B. Adulteration

 Plaintiffs contend that processed meat products containing MDM, which this regulation permits to be sold in the United States, should be considered adulterated within the meaning of the Federal Meat Inspection Act. Such products are "meat food products", 21 U.S.C. § 601(j). Under subsection (m) of that section, such a product is adulterated:

(1) if it bears or contains any poisonous or deleterious substance which may render it injurious to health; but in case the substance is not an added substance, such article shall not be considered adulterated under this clause if the quantity of such substance in or on such article does not ordinarily render it injurious to health;

\* \* \* \* \* \*

(8) if any valuable constituent has been in whole or in part omitted or abstracted therefrom; or if any substance has been substituted, wholly or in part therefor; or if damage or inferiority has been concealed in any manner; or if any substance has been added thereto or mixed or packed therewith so as to increase its bulk or weight, or reduce its quality or strength, or make it appear better or of greater value than it is;

\* \* \* \* \* \*

The Secretary argues that MDM containing bone particles or products containing MDM cannot be adulterated because the bone is actually "meat" under the Department's 1938 definition of meat, found at 9 C.F.R. § 301.2(tt). That section provides:

*Meat.* The part of the muscle of any cattle, sheep, swine, or goats, which is skeletal or which is found in the tongue, in the diaphragm, in the heart, or in the esophagus, with or without the accompanying and overlying fat, and the portions of bone, skin, sinew, nerve, and blood vessels which normally accompany the muscle tissue and which are not separated from it in the process of dressing.

\* \* \*

It seems almost too obvious to have to state that the bones permitted in meat by this definition are the t-bones in t-bone steaks or the leg in leg-of-lamb and the like. Ground up bits of bone entering the meat in the mechanical deboning process, or entering a processed meat with the addition of MDM, is clearly and totally outside the contemplation of this definition.

Section 601(m)(1) and (8) require the determination of whether a substance is an "added" substance as part of the determination of adulteration. Because bone particles are not part of "meat", they must be regarded as having been added to MDM during the mechanical process; obviously, bits of crushed bone do not "normally accompany the muscle tissue" after it is dressed by hand. Likewise, bone particles must be regarded as having been added to any final processed product to which MDM itself has been added. Section 601(m)(8), dealing with so-called economic adulteration, includes any such product where the added substance reduces the quality of the substance. The Court does not now have sufficient information to determine whether the use of MDM in processed or rendered products reduces their quality; the criteria for this determination appear to be nutritional and aesthetic. The Secretary claims to have determined that these criteria are satisfied at the levels specified by the regulation.

 As to the more health-related aspect of adulteration [§601(m)(1)], however, it is likely that the Secretary's approval of the use of MDM in this regulation will be found clearly erroneous. In the case of an added substance, the Secretary is required by the act to condemn meat containing such a substance if the substance "*may* render it injurious to health" (emphasis added). In order for the Secretary to approve the use of MDM as he has done in this regulation, therefore, he is required by law to have made a determination that there is no sub-

stantial possibility that the presence of bone particles in a concentration of .45% in processed products containing MDM could harm the health of those ingesting the products. It is not at all clear that the Secretary has made such determinations with the required thoroughness. In his preamble accompanying the proposed rulemaking issued at the same time as the interim regulation, he states:

> It is the Department's present position that the bone, if present in such a particle size or in such an amount as to be readily apparent to the taste or touch, would indeed be identifiable as bone and would be a reason for considering the product to be adulterated. However, modern equipment can minimize the particle size and level of bone to an extent that it cannot be detected by sensation in the mouth.

41 *Fed.Reg.* 17561. While this is a relevant consideration in terms of economic adulteration, it in no way satisfies the requirements under subsection (m)(1). The Secretary argues that he has also studied the nutritional aspects of MDM use, particularly in terms of its calcium content (bone is approximately 25% calcium) and the calcium requirements of the American diet. While nutrition is one criterion of the section 601(m)(1) health effects, and while the Court cannot say the Secretary's treatment of that issue is inadequate, consideration of nutritional problems alone is an insufficient basis for the health determination required. The Secretary argues that he has considered all health questions involved and has concluded that no health threats exist; he has submitted copies of some of the relevant literature to underscore this claim. A perusal of that literature, however, establishes that the Secretary has failed to consider adequately the health effects of MDM in at least three significant ways: first, the possible gastroenterological side effects which may result from frequent ingestion of bone particles; second, the possibly unduly high levels of strontium-90 which may be contained in bone particles in red meat MDM; third, the possible long-term effects of the fat content present in MDM on the cardio-vascular systems of those Americans for whom processed meat products constitute a significant portion of their diets. Accordingly, until the Secretary has adequately assessed these questions, MDM must be considered as a substance which may injure health, and therefore adulterated and an adulterant.

### C. Misbranding

■ A product is "misbranded" under § 601(n)(1) "if its labeling is false or misleading in any particular". While this issue has not been as fully argued by the parties, it does appear to the Court that the interim regulation permits misbranding of a product labelled, for example, "all beef franks", since the calcium content of such a product would be higher than that of a comparable produce without MDM. Since the public expects the usual product, it would be misled by the labelling permitted by the regulation. This could prove especially harmful to persons on calcium-restricted diets, who would be misled into thinking that the product contained no more than the usual amount of calcium. Moreover, since no standards of identity or composition for meat food products, where such standards exist, have been amended by the regulation, any such products containing MDM pursuant to the interim regulation would be misbranded under subsection (n)(7), as being at variance with such standards.

## II. OTHER INJUNCTIVE RELIEF CONSIDERATIONS

### A. The Public Interest

■ The paramount public interest to be vindicated here is the protection of the consuming public against possible health hazards posed by the use of MDM in meat products. The Secretary makes the argument—apparently seriously—that if this regulation is enjoined there will be no constraints on the inclusion of MDM in meat products by the meat packing industry. However the Secretary is required by § 606 of the Act to prevent the sale of any adulterated meat food products. In light of the fact that he has not made the studies and assessments necessary to say that MDM

does not adulterate such products, the Court can only assume that he will faithfully execute his duty under the law to prevent the distribution and sale of such products. No argument that he is powerless to do so can be made in good faith.

### B. Harm To The Defendants

 No significant harm will be visited upon the defendant by the suspension of the interim regulation. If he wants data on the mechanical deboning process and on the resulting product, he may require such information of the meat packers or may conduct such tests as are necessary himself. He may also conduct proceedings in conformity with the APA as may be appropriate. As to the harm to the meat packing industry, Congress has unequivocally determined that public health is to take precedence over commercial interests in this matter, and anything of which they are being deprived today is something to which they have no vested right, but are permitted to do only when certain regulatory prerequisites have been met. This process may of course be hastened by the cooperation of the industry in the development of the data necessary for that regulatory approval to be properly consummated.

### C. Irreparable Injury

The irreparable injury in this case is clear: the consumers represented by plaintiffs will be subject to unknown health hazards in the absence of this injunction. As we are becoming increasingly aware, ingestion of substances of whose effects we are uncertain now can have profound ramifications for our health much later. No possible way exists to compensate in the future for health problems triggered in the past, and this problem is especially significant to those low-income persons who are proportionally the greatest consumers of the products in which MDM is contained. Finally, it is well established that the harm suffered by those who would otherwise participate in agency rulemaking under the APA is to be considered irreparable when the agency fails to afford them their rights to such participation. Accordingly, it is by the Court this 10th day of September, 1976,

ORDERED, that plaintiffs' Motion For Preliminary Injunction be, and hereby is, granted; and

FURTHER ORDERED, that defendant Earl L. Butz, Secretary of Agriculture, his officers, servants, agents, employees, attorneys, and persons in active concert with him, are hereby enjoined from giving further effect to Section 319.3 of Title 9, Code of Federal Regulations, with respect to Mechanically Deboned Meat.