**COMMUNITY NUTRITION INSTITUTE, et al., Appellants,**

v.

**John R. BLOCK, Secretary of Agriculture, et al.**

**No. 82–2494.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 19, 1983.

Decided Dec. 5, 1984.

Katherine A. Meyer, Washington, D.C., with whom Alan B. Morrison, Washington, D.C., was on brief, for appellants.

Susan M. Chalker, Atty., Dept. of Justice, Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., Stanley S. Harris, U.S. Atty., Washington, D.C. (at the time the brief was filed) and Robert S. Greenspan, Atty., Dept. of Justice, Washington, D.C., were on brief, for appellees Block, et al.

Philip C. Olsson, Washington, D.C., with whom Richard L. Frank and Gary Jay Kushner, Washington, D.C., were on brief, for appellees, Western States Meat Ass'n, et al.

Before WILKEY, BORK and SCALIA, Circuit Judges.

Opinion for the Court filed by Circuit Judge SCALIA.

SCALIA, Circuit Judge:

This case, involving legal requirements for the content and labeling of meat products such as frankfurters, affords a rare opportunity to explore simultaneously both parts of Bismarck's aphorism that "No man should see how laws or sausages are made." At issue are regulations promulgated by the Secretary of Agriculture[1] prescribing labeling requirements for meat products made in part with meat separated from bone by crushing bones and meat and forcing the resulting paste through a sieve. Appellants challenge the regulations on grounds that they permit the sale of misbranded and adulterated food products, in violation of the Federal Meat Inspection Act, 21 U.S.C. §§ 601–95 (1982), and that they were promulgated in reliance upon scientific studies completed by the agency after the close of the rulemaking record, in violation of the Administrative Procedure Act.

## I

Traditional meat processing technology involves cutting meat off the carcass by hand before subjecting it to further pro-

---

1. We shall refer throughout this opinion to the Secretary, although the acts in question were actually performed by the Assistant Secretary for Marketing and Inspection Services or his subordinates, under authority delegated by the Secretary, *cf.* 7 C.F.R. § 2.17(g)(2)(ii) (1984).

cessing such as grinding or comminuting. The "meat" so derived consists of

> [t]he part of the muscle ... which is skeletal or which is found in the tongue, in the diaphragm, in the heart, or in the esophagus, with or without the accompanying and overlying fat, and the portions of bone, skin, sinew, nerve, and blood vessels which normally accompany the muscle tissue and which are not separated from it in the process of dressing.

9 C.F.R. § 301.2(tt) (1984).

Hand deboning wastes a significant amount of meat which cannot economically be removed from the bones. In the early 1960s the Japanese developed a mechanical deboning process based on the differential ability of comminuted flesh and bone to pass through fine sieves. The process has been used in this country since 1969 for poultry. In 1976 the Department of Agriculture first proposed allowing its use for red meat. In that application of the technique, the majority of the meat is usually removed by hand. The rest of the carcass is then mechanically crushed into a fine paste, which is forced through sieves that capture most of the crushed bone. The resulting product is a paste consisting primarily of skeletal muscle and associated tissue together with no more than 3% bone particles, 98% of which have a maximum size no greater than 0.5mm in their greatest dimension and none of which is larger than 0.85mm in its greatest dimension. *See* 9 C.F.R. § 319.5(a) (1984). Under the current regulations this product is known as "Mechanically Separated (Species)" ("MS(S)")—for example, Mechanically Separated Beef or Mechanically Separated Pork. *Id.*

In 1976, the Department of Agriculture proposed regulations which included MS(S)—then known as "Mechanically Deboned Meat" ("MDM")—within the definition of meat and permitted its use as an ingredient in processed meat food products without special labeling or inclusion in the ingredients statement under any name other than that of the species of meat. 41 Fed.Reg. 17,560 (1976). Under those proposed regu-

lations, consumers would have had no way of knowing that a meat food product such as frankfurters contained MDM. Simultaneously with the publication of the proposed regulations, the agency issued a related interim rule, to permit and regulate the production and distribution of MDM pending final rulemaking. 41 Fed.Reg. 17,-535 (1976). Community Nutrition Institute and others challenged the interim rule in the District Court, and obtained a preliminary injunction resting in part on the finding that the plaintiffs would probably be able to establish that it had been promulgated in violation of the requirements of the Administrative Procedure Act and that it unlawfully permitted sale of an adulterated and misbranded product. *Community Nutrition Institute v. Butz*, 420 F.Supp. 751, 754–56 (D.D.C.1976).

Before publication of the proposed and interim regulations, a taste panel had determined that the use of MDM in the proportions allowed by the regulations did not affect the taste of the product. *See* 41 Fed.Reg. 17,561 (1976). In response to *Community Nutrition Institute v. Butz*, the Secretary initiated further studies. A select panel of scientists from various government agencies found that nothing in bone or bone particles in the permitted amounts posed a health or safety problem for most people. The panel concluded that there were no health or safety reasons for requiring products containing MDM to bear nutrition labeling, but recommended that they note the presence of MDM in their statement of ingredients, so that those who must stringently restrict calcium intake could avoid them. It also recommended prohibiting the use of MDM in baby and junior foods because of lack of information on the possible danger of mottling of teeth from excessive fluoride intake. *See* 42 Fed.Reg. 54,439 (1977).

The Secretary subsequently published revised proposed regulations, 42 Fed.Reg. 54,437 (1977), and adopted final regulations, 43 Fed.Reg. 26,416 (1978). These established a standard of identity for the product, renamed "Mechanically Processed

(Species) Product" ("MP(S)P"), 9 C.F.R. § 319.5 (1979). They limited the use of MP(S)P to meat food products of a comminuted nature such as frankfurters and luncheon meats, and forbade its use for more than 20% of the meat portion, 9 C.F.R. § 319.6 (1979). They also established labeling requirements: In addition to identifying MP(S)P by name in the ingredients statement, the label was to bear two prominently lettered qualifying phrases next to the finished product name (*e.g.*, frankfurters), 9 C.F.R. § 317.2(j)(13) (1979). The first phrase, "With Mechanically Processed (Species) Product" was required on grounds that MP(S)P was a unique, unexpected ingredient, 43 Fed.Reg. 26,420 (1978). The second qualifying phrase, "Contains Up To —% Powdered Bone," was to advise persons on calcium restricted diets of the increased calcium content, *id.*

The Pacific Coast Meat Association ("PCMA") petitioned for a revision of these regulations on the ground that they required negative labeling and imposed unrealistic standards, accompanying its petition with an economic analysis of the regulations' impact. The Secretary denied the petition in May 1979, indicating, however, that he was open to a resubmission with compelling evidence on certain specified points, including consumer preference. PCMA resubmitted its petition in June 1979 with some further explanation and response to adverse comments. The Secretary denied the resubmitted petition in September because it contained no new evidence. In February 1981 PCMA, along with the American Meat Institute, again petitioned for amendment of the regulations, this time accompanying their petition with information of the sort the Secretary had referred to in his denial of the 1979 petition, including a market research study regarding consumer preferences and perceptions and a new and more extensive economic analysis. After reviewing the petition and accompanying reports, and developing his own Preliminary Regulatory Impact Analysis, the Secretary published yet another notice of proposed rulemaking, 46 Fed.Reg. 39,274 (1981). Based on consider-

ation of more than 1,600 comments on the proposal, he promulgated the final regulations challenged here, 47 Fed.Reg. 28,214 (1982). These left virtually unchanged the restrictions on product composition and use but modified the labeling requirements. They changed the product name from Mechanically Processed (Species) Product to Mechanically Separated (Species), *see* 9 C.F.R. § 319.5(a) (1984), eliminated the qualifying phrase indicating the presence of MP(S)P but retained the requirement that MS(S) be listed in the ingredient statement, 9 C.F.R. § 317.2(f)(1) (1984), and replaced the powdered bone content qualifying phrase with calcium content information, *see* 9 C.F.R. § 317.2(j)(13).

Appellants in this case, the Community Nutrition Institute and three other consumer groups, filed suit in the district court seeking to invalidate the regulations. Though the interest of all of them does not appear, Virginia Citizens' Consumer Council alleges that the Secretary's action harmed its approximately 500 members who eat meat and meat products. On cross-motions for summary judgment, the court granted appellees' motion, holding that the regulations were rationally based and supported by evidence in the administrative record, and that the Secretary did not violate the Administrative Procedure Act by promulgating them without affording appellants an opportunity to comment on certain studies. *Community Nutrition Institute, Inc. v. Block*, Civil No. 82–2009, slip op. (D.D.C. Dec. 1, 1982) ("mem. op."). This appeal ensued. We have jurisdiction under 28 U.S.C. § 1291 (1982).

## II

The Secretary of Agriculture has express statutory authority to "make such rules and regulations as are necessary for the efficient execution" of the Federal Meat Inspection Act, 21 U.S.C. § 621, and to prescribe "definitions and standards of identity or composition" for meat food products, 21 U.S.C. § 607(c). The Secretary has broad discretion over the content of meat food product labels, *see generally*

*National Pork Producers Council v. Bergland,* 631 F.2d 1353, 1362 (8th Cir. 1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1350, 67 L.Ed.2d 335 (1981); *American Public Health Association v. Butz,* 511 F.2d 331, 335 (D.C.Cir.1974),[2] and courts may set aside his determinations only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A) (1982). Moreover, the relatively unspecific nature of the labeling standard which Congress has prescribed (the Secretary may prohibit labeling that is "false or misleading in any particular," 21 U.S.C. § 607(e)), combined with the evident need for expert and technical judgment in applying that standard, suggests that this is an area in which courts must give great deference to the Secretary's judgments, *cf. American Meat Institute v. United States Department of Agriculture,* 646 F.2d 125, 127 (4th Cir. 1981).

This standard of review is not altered by the fact that the rules here under challenge revise preexisting rules. Even when an agency reverses a "settled course of behavior," it is required only to supply a reasoned analysis for the change. *See Motor Vehicle Manufacturers' Association v. State Farm Automobile Insurance Co.,* 463 U.S. 29, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). We need only inquire whether the change " 'was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' " *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) (*quoting Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *cited with approval in Motor Vehicle Manufacturers' Association,* 103 S.Ct. at 2867).

---

**2.** Meat food products are also subject to definitions and standards of identity and to labeling requirements under the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 341, 343 (1982), which is administered by the Secretary of Health and Human Services. As regards defini-

## III

Appellants contend the new regulations are unlawful because they permit the sale of misbranded products in contravention of 21 U.S.C. § 610(d). As evidence of misbranding, they point to the change of name from MP(S)P to MS(S) and to the deletion of the two prominently displayed qualifying phrases from the product labels.

As to the name change from Mechanically Processed (Species) Product to Mechanically Separated (Species): The Secretary explained deletion of the word "product" on grounds that it was unnecessary and inconsistent with the labeling requirements for other types of food. He also found on the basis of the Study of Consumer Attitudes submitted by the Pacific Coast Meat Association that use of the word "product" might confuse or misinform consumers— by leading them to believe, for example, that MP(S)P contains artificial ingredients or is fabricated from nonlivestock ingredients. 47 Fed.Reg. 28,223–25 (1982). He justified the change from "processed" to "separated" on the ground that the latter term is more specific and should be more informative to consumers. *Id.* at 28,225.

Although we agree with the District Judge that "both names are minimally informative," mem. op. at 23, we also agree that the Secretary's decision cannot be considered arbitrary or unsupported by the record. Contrary to appellants' contention, it seems to us that the term "mechanically separated beef" carries no more suggestion of 100% absence of bone than does the term "mechanically processed beef"—and appellants produced no consumer survey data that would indicate otherwise. It is true that in 1978 the Secretary justified the change of the relevant adjective from "mechanically deboned" to "mechanically processed" on grounds that use of the word "deboned" would suggest that the product contained no bone. 43 Fed.Reg. 26,420

---

tions and standards of identity, Congress has expressly required the Secretary of Agriculture's promulgations to be consistent with standards prescribed under the FFDCA, 21 U.S.C. § 607(c)(2). It seems likely that a similar limitation with regard to labeling is implicit.

(1978). But the word "separated" does not clearly contain the same suggestion.

As to the elimination of the prominently displayed qualifying phrases: The Secretary justified deleting the qualifying phrase indicating the presence of MP(S)P in the product name on grounds that his criterion for requiring such labeling is not whether the product contains a new or unexpected ingredient but rather whether that ingredient "significantly alters the basic identity of the finished product," 47 Fed.Reg. 28,248 (1982). When used as permitted by the regulations, he found, MS(S) does not meet this test, *id.* Deleting the qualifying phrase does not deprive consumers of the ability to know what they are buying, he said, because the presence of MS(S) is indicated in the ingredients statement which is "the one place that is specifically and explicitly designated for this purpose," *id.* at 28,246. The Secretary expressed concern moreover, that highlighting the presence of MS(S) in a qualifying phrase associated with the product name—for example, "Frankfurters With Mechanically Separated Beef"—might contribute to misperceptions about the characteristics and quality of the finished products, *id.* at 28,248.

With regard to the qualifying phrase "Contains Up To —% Powdered Bone," the Secretary explained that this had originally been required on health grounds. Since, he reasoned, the sole health risk associated with the use of MS(S) in accordance with the regulations is increased calcium levels, a calcium content statement would directly provide all needed health information without creating an unwarranted negative impression of the finished product. *Id.* at 28,249–50.

On both of these labeling points, we find it impossible to say that the Secretary's analysis is irrational. Appellants challenge his action on grounds that MS(S) may pose health risks to those especially sensitive to cholesterol, lead or nucleic acids, and that such persons would have received fuller notice of potential risks from the old labeling with its two prominently lettered qualifications.[3] Our examination of the record discloses that the Secretary fully considered each of the health risks alleged by appellants, finding none of them significant; and that there was substantial evidence to support his findings.

Appellants rely upon the Supreme Court's decision in *United States v. Ninety-Five Barrels (More or Less) Alleged Apple Cider Vinegar*, 265 U.S. 438, 44 S.Ct. 529, 68 L.Ed. 1094 (1924), and upon our decision in *Federation of Homemakers v. Butz*, 466 F.2d 462 (D.C.Cir.1972). In *Ninety-Five Barrels*, the Supreme Court found misleading labels that designated as "Apple Cider Vinegar" a product made from dried apples, when both Department of Agriculture definitions and popular understanding defined Apple Cider Vinegar as vinegar made from the juice of apples. In *Federation of Homemakers* we found misleading labels that described as "all meat" frankfurters which contained only 85% meat. According to appellants, a frankfurter whose meat portion consists of 20% MS(S) is so different from the product that consumers expect when they purchase frankfurters that to call it a frankfurter without further qualification is as misleading as to call a product made from dried apples "cider vinegar" or a frankfurter that is only 85% meat "all meat". We find these parallels far-fetched. The Secretary has prohibited the use of MS(S) in products such as hamburger, in which the public expects to receive only ground meat. Its use is permitted only in products such as

---

**3.** Appellants raise these concerns in the section of their brief that deals with economic adulteration—*i.e.,* adulteration through substitution of inferior products, as defined by 21 U.S.C. § 601(m)(8). Because we fail to see their relevance to that point, we consider them here, in the context of the misbranding claim. Health concerns would also support a claim that products containing MS(S) are adulterated as containing a "poisonous or deleterious substance which may render [them] injurious to health," 21 U.S.C. § 601(m)(1). Appellants do not make such a claim, and if they did it would be refuted by the same findings we consider here in the misbranding context.

sausages, *whose normal composition includes a significant proportion of ingredients other than meat.* 9 C.F.R. § 319.-6(c), (d). This particular ingredient, moreover, when used in the maximum proportions permitted by the regulations, was shown by scientific studies and taste tests to affect neither the nutritional nor the organoleptic characteristics of the product.

Appellants present no survey or other evidence to support their contention that a frankfurter with MS(S) is not a frankfurter. They rely on the District Court's finding in *Community Nutrition Institute v. Butz,* 420 F.Supp. at 756, that a frankfurter containing MS(S) would be mislabeled "[s]ince the public expects the usual product, [and] it would be misled by" labeling with the ordinary name of the product. That was not a final determination, however, but only a tentative assessment made to support the issuance of a preliminary injunction pending resolution of the issue. It is not even law of the case, much less res judicata in other litigation. *See University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981) ("findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits"); *Kuzinich v. County of Santa Clara,* 689 F.2d 1345, 1350–51 (9th Cir. 1982) ("issues litigated in a preliminary injunction action are not res judicata and do not form a basis for collateral estoppel"). Moreover, the opinion explicitly acknowledged that that issue had "not been as fully argued by the parties" as other aspects of the case, *Community Nutrition Institute v. Butz,* 420 F.Supp. at 756. The court had little or no evidence on which to base its assessment of what consumers do and do not expect in sausages, as is apparent from the arm-chair nature of the conclusions expressed in the half-column of the opinion devoted to this complex issue. Finally, the regulations at issue in *Butz* did not, like those before us here, require the inclusion of any additional information in the ingredients statement.

Appellants also rely on the Secretary of Agriculture's determination in 1978—after the District Court issued the preliminary injunction against the interim regulation—that MS(S) (then known as MP(S)P) should be prominently displayed on the label because it is "unique and would not be an expected ingredient in a product." 43 Fed. Reg. 26,420 (1978). We see no reason why the test the Secretary adopted in 1978 (which itself produced a conclusion contrary to that he had reached before the District Court enjoined the interim regulation) should be given greater weight than the test he adopted in 1982, based on considerable additional data including a consumer study. Neither the District Court's unanalyzed dictum in *Butz* nor the Secretary's 1978 determination constitutes sufficient evidence to permit us to pronounce arbitrary the Secretary's considered and expert determination that no labeling beyond the inclusion of MS(S) in the ingredients is required.

Appellants' final argument in favor of their misbranding claim seems to be that because the record shows that many consumers would be unwilling to buy products whose labels announce in large type that they contain Mechanically Processed Beef Product and ground bone, such labeling must be necessary to avoid misbranding. This claim rests on the assumption that the label must prominently display all information which is material in the sense that it would lead consumers to modify their behavior, whether rationally or irrationally— at least where the information pertains to new and unexpected ingredients. That is not so. A virtually unlimited variety of information might cause large numbers of consumers to modify their behavior. Many might disfavor, for instance, meat from animals anesthetised with carbon dioxide gas prior to being slaughtered, *cf.* 9 C.F.R. § 313.5 (1984); meat from cattle afflicted with tapeworm cysts, *cf.* 9 C.F.R. § 311.23; or liver sausage that contains lips, snouts, and ears, *cf.* 9 C.F.R. §§ 319.182(b), 301.-2(tt), (uu). If such information were prominently displayed on food labels, it might well affect consumers' behavior as much as the information here under discussion; but

that does not suffice to make such labeling necessary. *See generally American Public Health Association v. Butz,* 511 F.2d at 332–335 (Secretary not obliged to require labels on fresh meat indicating that it contains Salmonellae and other bacteria which may cause food poisoning if food is improperly handled). And we see no reason why, in this regard, the new and unexpected (meat from anesthetized cattle or MS(S)) is any different from the old and unexpected (meat from cattle afflicted with tapeworm cysts, and ears and snouts). It must be borne in mind that the issue here is not whether MS(S) shall *appear* on the label (the regulations require its inclusion among the ingredients) but whether it shall be prominently displayed. Only a limited amount of information can be accorded such treatment, and certainly not all information that would in fact affect consumer behavior. Thus, the judgment committed to the Secretary necessarily involves a degree of what can pejoratively be called paternalism: he must decide what consumers *should* want to be prominently informed of. The Secretary's rule of requiring a qualifying phrase associated with the name of the finished product only when the ingredient—whether or not unexpected—affects product identity sufficiently to result in a distinctive version of that type of product, 47 Fed.Reg. 28,247–49 (1982), is not unreasonable. Nor is the result of applying that rule here—which permits the inclusion, without prominent labeling, in products that are not exclusively meat, of an ingredient that is overwhelmingly meat, and which, when used in the allowed proportions, does not alter the taste or texture of the product. The Secretary was acting at least within the bounds of reason, if not unquestionably correctly, when he determined that prominent labeling of the sort appellants seek would mislead rather than inform, just as it would be misleading (and have a similarly undesirable effect upon a

perfectly wholesome product) to require that frankfurters be prominently labeled "Made with Comminuted Meat, Including Esophagus." [4]

Appellants also argue that products containing MS(S) are adulterated as that term is defined in 21 U.S.C. § 601(m)(8), because inferior products have been substituted. Nonetheless, although the statute clearly prohibits the sale of all adulterated products, 21 U.S.C. § 610(c), appellants specifically "do not ask that meat food products containing MS(S) be banned from the market," Brief for Appellants at 37, but ask only for fuller labeling. This convinces us that appellants are really only presenting their misbranding claim under a different label. In any case, the claim of economic adulteration rests upon the same arguments we rejected above in our discussion of misbranding.

■ Finally, appellants challenge the regulations on grounds that the agency violated the Administrative Procedure Act, 5 U.S.C. § 553(c) (1982), by relying on two scientific studies completed by its staff after the close of the comment period without giving interested parties an opportunity to comment on them. They cite *Portland Cement Association v. Ruckelshaus,* 486 F.2d 375, 393 (D.C.Cir.1973), *cert. denied,* 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974), for the proposition that "[i]t is not consonant with the purpose of a rule-making proceeding to promulgate rules on the basis of ... data that, [in] critical degree, is known only to the agency." The Secretary responds that he relied on these studies only to support retention of the 20% use limit of MS(S), a feature of the regulation appellants do not challenge. The record reveals, however, that the Secretary also relied on the studies in part for his determination that a calcium content labeling requirement would be adequate without any further indication of the presence of

---

**4.** Frankfurter labeling need not include esophagus even in the statement of ingredients. *See* 9 C.F.R. § 301.2(tt) (1984). The fastidious reader will be comforted to know, however, that snouts and ears cannot be included unless the product name contains the phrase "with variety meats" or "with by-products." 9 C.F.R. § 319.180(b). Not so, of course, with liver sausage (liverwurst), where one takes his chances. *See* 9 C.F.R. § 319.182(b).

ground bone because the nucleic acid content of MS(S) presents no risk.

The studies here in question, unlike the study in *Portland Cement,* did not provide entirely new information "critical" to the Secretary's determination. To the extent that they supported the challenged labeling change, they expanded on and confirmed information concerning the nucleic acid content of MS(S) which the Secretary had summarized in his notice of proposed rulemaking, *see* 46 Fed.Reg. 39,289 (1981). The notice also requested further information on the subject. CNI did not provide that, but did point out a possible methodological flaw in the studies relied on by the Secretary, to-wit that they used MP(S)P only from older, female cattle and chickens and thus might not be accurate with regard to the product in general. The supplementary studies were specifically addressed to those alleged deficiencies, testing for nucleic acid samples of MS(S) produced by each of the four existing processing plants for meat, three of which were producing mechanically separated beef and the fourth mechanically separated veal. These confirmed the earlier studies' conclusion that any increase in the nucleic acid content of food containing MS(S) would be so small that it would present no health risks even for individuals suffering from gout.

Rulemaking proceedings would never end if an agency's response to comments must always be made the subject of additional comments. The response may, moreover, take the form of new scientific studies without entailing the procedural consequence appellants would impose, unless prejudice is shown. There was no such showing here, where appellants do not even suggest that the new studies were defective in any way. It is impossible to perceive why correction of an asserted deficiency in earlier studies—which correction confirms the accuracy of those studies—should give rise to an additional opportunity to comment. We conclude that the Secretary did not violate the Administrative Procedure Act.

For the reasons stated, the judgment of the District Court is

*Affirmed.*