INDEPENDENT U.S. TANKER
OWNERS COMMITTEE,
Plaintiff,

v.

Elizabeth H. DOLE, et al., Defendants.

ALASKA BULK CARRIERS, INC.,
et al., Plaintiffs,

v.

Elizabeth H. DOLE, et al., Defendants.

FIRST ATTRANSCO TANKER CORP.,
et al., Plaintiffs,

v.

Elizabeth H. DOLE, et al., Defendants.

OVERSEAS SHIPHOLDING GROUP,
INC., Plaintiff,

v.

Elizabeth H. DOLE, et al., Defendants.

Civ. A. Nos. 85–1555, 85–1740,
85–1752 and 85–1771.

United States District Court,
District of Columbia.

Oct. 25, 1985.

Joseph A. Klausner, Allan A. Tuttle, Washington, D.C., for Independent U.S. Tanker.

Robert J. Blackwell, Anne E. Mickey, Washington, D.C., for Alaska Bulk Carriers.

Amy Loeserman Klein, Washington, D.C., for First Attransco Tanker.

Daniel P. Levitt, New York City, for Overseas Shipholding.

Michael Joseph, Washington, D.C., for Atlantic Richfield—defendant intervenors.

Richard H. Saltsman, Washington, D.C., for American Petrofina—defendant intervenors.

William E. McDaniels, Washington, D.C., for Seatrain—plaintiff intervenor.

Leslie K. Dellon, Dept. Justice, Civil Div., Washington, D.C., for Justice Dept.

Cleveland Thornton, Office Gen. Counsel, Dept. of Transp., Washington, D.C., for Dept. Transp.

Richard J. Wertheimer, Washington, D.C., for Overseas Shipholding.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

These consolidated cases represent a renewal of the protracted conflict between the Executive Branch official responsible for the administration of the Merchant Marine Act of 1936, 46 U.S.C.App. §§ 1151 *et seq.* (1982 & Supp. I 1983), (the "Act"),[1] and an *ad hoc* guild of shipowners who fear an infringement of the franchise they presently enjoy under the Act and related legislation.

Plaintiffs are owners and operators of various-sized U.S.-flag tankers built entirely with private capital and now employed in the domestic trade, primarily in the transport of crude oil from the oil fields of the Alaskan North Slope ("ANS") to Panama. Defendant Secretary of Transportation (the "Secretary") has, by rule last published May 7, 1985 (the "payback rule"), purported to enable similar vessels built with government subsidies to be relieved of statutory restrictions on competition with plaintiffs' ships in the same trade by repaying their subsidies within the year.[2] Defendant-intervenors are subsidized-vessel owners/operators who expect to avail themselves of the payback rule. At issue is whether, and, if so, to what extent and in what circumstances, the Secretary may lawfully implement the payback rule. The cases are presently before the Court on cross-motions for summary judgment, and, because they entail only a review of agency action taken pursuant to the notice-and-comment provisions of the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* (1982) ("APA"), the parties agree that there are no material issues of fact in dispute which could be tried in this forum. *See Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).[3] For the reasons set forth below, the Court concludes that the Secretary acted in accordance with law and within the limits of her discretion, and will, therefore, deny plaintiffs' motions for summary judgment, grant those of defendant and defendant-intervenors, and dismiss the several complaints with prejudice.

---

1. Administration of the Act was originally entrusted to the Secretary of Commerce, and, within his Department, the Maritime Subsidy Board and the Maritime Administration ("MarAd"). In 1981 both the responsibility and the administering agencies were transferred to the Secretary of Transportation by Pub.L. No. 97–31, 95 Stat. 151 (1981). *See, generally, Independent U.S. Tanker Owners Committee v. Lewis,* 690 F.2d 908, 910 n. 1 (D.C.Cir.1982). All references to "the Secretary" herein are to the responsible Executive Branch officers at the relevant time, irrespective of the departments in which they served.

2. Another shipowner, Seatrain Lines, Inc., *see infra,* has recently moved to intervene as a par-

ty-plaintiff, alleging that the competition it anticipates for its vessels previously admitted to the domestic trade as hardship cases will be ruinous, and those still outside—all idle—which would like to repay their construction subsidies are unable to do so without further financial aid from the government, which is unlikely to be forthcoming. Those defendants who oppose the motion for leave to intervene do so on standing and timeliness grounds. The motion is granted.

3. Jurisdiction is predicated upon §§ 701 *et seq.* of the APA, and 28 U.S.C. §§ 1331, 1333, 1337, 1651, 2201–02 (1982). Review is sought pursuant to § 706(2)(A) of the APA.

## I.

The twentieth-century tribulations of the American maritime industry have been well-documented in the history of the legislation which has been enacted for its protection and in the judicial antecedents of this case.[4] In brief and general summary, the U.S. merchant marine has been so beset by circumstances—including, *inter alia,* large subsidies given by other trading nations to their own flag fleets, and the higher wages, safety standards, and costs of operation obtaining aboard its own—that it has been rendered largely uncompetitive with foreign merchantmen at sea. To redress its competitive disadvantages and encourage American shipping abroad, therefore, Congress has for a number of years authorized construction and operating differential subsidies ("CDS" and "ODS," respectively) to be paid by the government for ships to be built in U.S. shipyards which are destined for carriage in foreign commerce under the U.S. flag. 46 U.S.C.App. §§ 1151–61. Only U.S.-flag vessels which have received no construction or operating differential subsidies, however, are eligible to participate in an artificial domestic shipping market from which both foreign carriers and government-subsidized U.S.-flag ships are excluded by Section 27 of the Merchant Marine Act of 1920 (the "Jones Act"), 46 U.S.C.App. § 883 (1982 & Supp. I 1983), and Section 506 of the Act of 1936, 46 U.S.C.App. § 1156 (1982 & Supp. I 1983). The U.S.-flag fleet is, thus, divided generally into two distinct segments: the so-called "Jones Act fleet," operating exclusively in the protected U.S. domestic trade, safe from all but intramural competition; and the subsidized overseas fleet, permitted, as a matter of policy, to operate only in foreign commerce.[5]

Even with the substantial help of government subsidies, however, U.S.-flag tankers have fared poorly in the international mercantile competition over the course of the last decade. Primarily as a result of market forces beyond the United States'—or any one nation's—control, world shipping rates have fallen below the break-even costs of the subsidized American industry. At the same time, however, not altogether by coincidence, the domestic market has flourished, especially down the West Coast *en route* from the Alaskan oil fields to Panama. As a result, since the late 1970s, substantial pressure has been building to relax the strictures of Section 506 of the Act and admit subsidized tankers to the domestic trade to share the bounty.

In 1980, the Supreme Court held the Secretary to have authority to release a single financially-distressed CDS vessel permanently from its foreign trade commitment, provided the unamortized portion of its subsidy were repaid with interest. *Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. 572, 100 S.Ct. 800, 63 L.Ed.2d 36 (1980). Although the *Seatrain* case involved but one ship in unique circumstances of duress upon which the Supreme Court dwelt at length in its opinion, shortly after the decision MarAd issued what it called an "interim" rule of general applicability which would have permitted certain other vessels to repay their CDS to gain admission to the domestic trade, upon a showing of exceptional circumstances and after a determination that no favorable employ-

---

**4.** *See, generally, Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. 572, 574–75, 584, 100 S.Ct. 800, 802–03, 807, 63 L.Ed.2d 36 (1980); *Independent U.S. Tanker Owners Comm. v. Lewis,* 690 F.2d 908, 911–13 (D.C.Cir.1982). *See also* Kurtz & Isikoff, *Industry Foundering In an Ocean of Aid,* Washington Post, July 16, 1985, at A1, col. 1.

**5.** To prevent unfair competition between its subsidized vessels and those constructed and operated entirely with private capital, the U.S. has required that any ship built with CDS funds operate exclusively in foreign trade, with two

minor exceptions: CDS vessels may sail in the domestic trade on either the first or last leg of an overseas voyage, and MarAd may consent to the operation of a CDS tanker in the domestic trade for up to six months in any 12-month period whenever it determines that "such transfer is necessary or appropriate to carry out the purposes" of the Act. Proportional repayment of the subsidy is required under either exception. 46 U.S.C.App. § 1156. *See Atlantic Richfield Co. v. United States,* 774 F.2d 1193 (D.C.Cir.1985).

ment opportunities existed for them in foreign commerce. Then, pursuant to its "interim" rule, MarAd granted an application for repayment of its CDS by a second large tanker.

The "interim" rule was immediately challenged by plaintiff Independent U.S. Tanker Owners Committee ("ITOC") on both procedural and substantive grounds vaticinal of most of those it asserts here.[6] In September, 1982, the court of appeals struck down the "interim" rule for MarAd's failure to accompany it with a statement of basis and purpose, and remanded to the district court with instructions to vacate the "interim" rule and order new rulemaking proceedings. *Independent U.S. Tanker Owners Committee v. Lewis,* 690 F.2d 908, 918–20 (D.C.Cir.1982) (hereinafter cited as *"ITOC"*).

On January 31, 1983, therefore, the Department of Transportation published the immediate ancestor of the instant payback rule, which purported to permit the repayment of its CDS by any vessel without first requiring a demonstration of economic necessity. 48 Fed.Reg. 4408 (1983). While the rulemaking was pending, however, Congress acted, on three separate occasions, to preclude implementation of the proposed rule for finite periods, the last prohibition expiring May 15, 1985.[7] A week earlier, anticipating the removal of the impediment, the Secretary promulgated the instant payback rule, in its present and final form, 50 Fed.Reg. 19,170 (1985) (to be codified at 40 C.F.R. pt 276) (proposed May 7, 1985), to become effective one month later. The payback rule provides, in substance, that any tanker vessel built with CDS may repay its subsidy, with interest, in return for permission to permanently enter the domestic trade, conditioned only by a requirement that the repayment obligation be satisfied by June 8, 1986.

During the two-year hiatus occasioned by Congress' moratoria on implementation of the rule, plaintiffs, or some of them, petitioned the Secretary to reopen the record to receive comments with respect to "changed circumstances" in the interim. But, although it appears from the record that some additional comments were received informally from other interested parties, plaintiffs' petitions to reopen were formally denied, in conjunction with the promulgation of the rule in final form, on the ground that the reopening of the record was both unnecessary (the Secretary having been already sufficiently apprised of plaintiffs' positions) and would serve only to delay the matter further. The Secretary also stated that she was receiving "up-to-date" information from the Department of Energy and other sources, bringing to her attention directly any "changed circumstances."

## II.

### *The Secretary's Authority Under the Act*

■ Notwithstanding the *Seatrain* case, *supra,* plaintiffs say, the Secretary lacks authority under the Act to lift domestic trading restrictions on *all* CDS-built vessels by means of single rule which applies automatically to the entire subsidized tanker fleet without regard to circumstances. The Secretary maintains the issue was determined in her favor by the Supreme Court in *Seatrain.*

---

**6.** Unlike the payback rule, however, the "interim" rule contemplated *ad hoc* determinations of each individual application for a CDS repayment, afforded notice and opportunity to comment as to each, and required, as a necessary condition for approval, a showing that "no favorable opportunities exist for viable employment of the vessel in the foreign trade." 46 C.F.R. § 276.3(b) (1984).

**7.** *See* Department of Transportation Appropriations Act, FY 1984, Pub.L. No. 98–78, 97 Stat.

453; Department of Commerce Appropriations Act, FY 1984, Pub.L. No. 98–166, 97 Stat. 1071; and Department of Commerce, Justice and State Department Appropriations Act, FY 1985, Pub.L. No. 98–411, 98 Stat. 1545.

The Court is informed that on June 12, 1985, the House of Representatives passed a similar prohibition which is now pending before the entire Congress as part of the 1985 supplemental budget proposal.

It is certainly arguable that *Seatrain* was limited to its facts. The case concerned the approval of the application of a single CDS tanker for admission to the domestic trade, not an entire flotilla, and in upholding the Secretary's authority to allow the application conditioned upon a repayment of its CDS, the Supreme Court remarked upon market conditions, took into consideration the straitened circumstances of the vessel's owner, and then concluded that nothing in the Act suggested that "the Secretary is forbidden to approve transactions *of this sort under these circumstances.*" 444 U.S. at 588, 100 S.Ct. at 809 (emphasis added).

On the other hand, it is manifest from the balance of the *Seatrain* opinion that the Supreme Court ruled as it did as a matter of statutory construction, not in review of an exercise of administrative discretion. "The primary question for decision" was, as the Court stated it, "whether the Secretary ... may terminate the restrictions imposed pursuant to [the Act] when the owners of a vessel constructed with a CDS repay that subsidy in full." *Id.* at 574, 100 S.Ct. at 802. It said nothing about the plight of the applicant or the state of the market. And, in reversing a decision of the court of appeals for this circuit which had found, in the express provision in Section 506 of the Act for *temporary* admissions of CDS vessels to the domestic trade upon specified conditions, an implied prohibition of *permanent* admissions upon any conditions, the Court said:

> The Court of Appeals was of the view that the specific exceptions in § 506 marked the limit of the Secretary's authority to approve entry of subsidized vessels into the domestic trade. By its logic, detail, and legislative history, the panel majority reasoned, that section prohibits transactions like the one before us.

In consequence, that court found the broad sweep of the Secretary's power under the balance of the Act irrelevant, the express language giving the Secretary authority to make and amend contracts unimportant, and the policy arguments advanced by the Secretary unpersuasive.

We disagree. On the face of the statute, the Secretary's broad contracting powers and discretion to administer the Act seem to comprehend the authority urged by petitioners here.

*Id.* at 587–88, 100 S.Ct. at 809–10 (footnote omitted). "In conclusion," it said, "we hold that the Act empowers the Secretary to approve full-repayment/permanent-release transactions of the type at issue here.... [W]e express no view upon the merits of the Secretary's particular exercise of discretion with regard to the [vessel involved] since that issue is not before us." *Id.* at 597, 100 S.Ct. at 814.

This Court concludes that *Seatrain* did confirm the discretionary authority of the Secretary under the Act to admit CDS-built vessels to the domestic trade, upon repayment of their subsidies, in circumstances otherwise undefined.[8] It must, therefore, consider whether the authority can be exercised without regard to individual circumstances at all other than generic market conditions for U.S.-flag tankers and consumers of their services.

*Conformity of the Payback Rule With the Act*

█ Plaintiffs take issue with the payback rule itself in multiple respects. Assuming her discretion in the matter, they assert, the Secretary has abused it grievously by promulgating a rule with so drastic and precipitous an impact upon an entire industry that it will confound each of the purposes the Act proclaims for itself.[9]

**8.** The court of appeals subsequently observed of *Seatrain* in *ITOC v. Lewis, supra,* "The Supreme Court specifically did not address the question ... of when or how [the Secretary] might exercise this discretion [to allow permanent repayment and entry into the domestic trade] in ac-

cordance with the purposes of the Act." 690 F.2d at 913–14 & n. 17.

**9.** 46 U.S.C. § 1101 provides in pertinent part:
It is necessary for the national defense and development of its foreign and domestic commerce that the United States shall have a

Plaintiffs maintain that the rule would compromise national defense because it would deplete the merchant fleet of the smaller, so-called "handy-tankers" which are most useful for military purposes. They argue that the rule imperils civilian commerce, because it abrogates the two-fleet principle embodied in the Jones Act, invites the *en masse* abandonment of foreign commerce by U.S.-flag vessels altogether, and threatens the vitality of the domestic trade fleet by suffusing the market with a vast overtonnage. The decline of the domestic fleet would, in turn, diminish the number of jobs available for American merchant seamen. Moreover, the intensified competition would most severely affect the newer tankers in the ANS fleet, according to plaintiffs, because those ships are, as a rule, both debt-ridden and not fully written off, and must, therefore, operate at higher rates in order to cover costs. The result will be, according to plaintiffs, contrary to the Secretary's expectations, antithetical to the Act's objective of a modern and efficient merchant marine with the

"safest" and "best" equipment aboard. Finally, plaintiffs submit that the influx of existing large CDS tankers into the ANS trade will significantly reduce demand for new tankers for the domestic trade, historically the largest consumer of new ship construction, thus idling the shipyards where they might have been built.[10]

The Secretary's response to each point invokes the same Darwinian principles, but the points are, each and all, touched upon, directly or indirectly, in her commentary accompanying the rule and the administrative record. Confronted with a surfeit of underemployed U.S.-flag vessels generally, she says, and an artificially dislocated market for their services, she has determined to dispense with at least one of the artifices within her control in the hope that disinhibited competition will, over time, distill the best U.S.-flag merchant tanker fleet of which present circumstances will admit, although admittedly less than everyone would desire.

Plaintiffs' objections are all, in substance, simply that the Secretary has

---

merchant marine (a) sufficient to carry its domestic water-borne commerce and a substantial portion of the water-borne export and import foreign commerce ... and to provide shipping service essential for maintaining the flow of such domestic and foreign ... commerce at all times, (b) capable of serving as a naval and military auxiliary, ... (c) owned and operated under the United States flag by citizens of the United States, ... (d) composed of the best-equipped, safest, and most suitable types of vessels, constructed in the United States and manned with a trained and efficient citizen personnel, and (e) supplemented by efficient facilities for shipbuilding and repair. It is declared to be the policy of the United States to foster the development and encourage the maintenance of such a merchant marine.

*See also, Seatrain,* 444 U.S. at 584 & n. 25, 100 S.Ct. at 807–08 & n. 25.

**10.** Plaintiff Overseas Shipholding Group, Inc. ("OSG") also argues that the Secretary's rulemaking was inadequate in its failure to include an Environmental Impact Statement ("EIS") or satisfactorily explain its absence, as required by the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321 *et seq.* (1982 & Supp. I 1983) ("NEPA").

NEPA requires that the promulgation of any rule be accompanied by an EIS, 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.9 (1985), unless

the agency finds that the rule will have "no significant impact" on the quality of the human environment. 40 C.F.R. § 1508.13 (1985). A finding of "no impact," in turn, must be supported by an environmental assessment ("EA"), containing "sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact." 40 C.F.R. §§ 1501.4, 1508.9.

The Secretary made such a finding, basing it upon a 65-page EA accompanying the rule, A.R. at 2490–2555, which discussed its potential hazards, the most significant being, of course, oil spills. The Secretary concluded that, some large CDS vessels being already in the trade, the nature of the hazard was merely more of the same rather an hitherto unencountered risk, and that larger vessels carrying the same quantity of oil would mean fewer voyages on which spills might occur.

Moreover, it appears that a comprehensive EIS was prepared in May, 1973, in connection with the CDS *payment* program, which explored in detail the environmental hazards attendant upon, *inter alia,* the transport of crude oil by the very ships now expected to *repay* their subsidies. Since the nature of those hazards is unaffected by the character of the vessels as payee or payor, there seems little point in studying the matter again.

grossly underestimated the rule's sanguinary consequences, and that its ultimate effect will not be the survival of the fittest but the extinction of the entire species. But having been presented with an agency record which speaks to all the concerns to which plaintiffs give expression, this Court cannot, within the limits of the scope of the review it is permitted to make of the payback rule, find that the Secretary has failed to give consideration to the relevant factors or has made a clear error of judgment in her disposition of them. *See Center for Auto Safety v. Peck,* 751 F.2d 1336, 1342 (D.C.Cir.1985) *quoting Motor Vehicle Manufacturers Ass'n, Inc. v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983).

*The Secretary's Consideration of Post-Comment Data*

■ During the two-plus years the payback rule lay dormant at congressional direction, the domestic shipping market obviously did not. Oil was shipped from ANS, and data was generated with respect thereto, which were not in anyone's contemplation when the payback rule was first published in 1983. Both plaintiffs and the Secretary draw upon the data to make projections and predictions for the future. The Secretary continues to foresee a decline in shipping costs with some, albeit acceptable, attrition of the least efficient vessels from the Jones Act fleet. Plaintiffs say the figures are considerably more lugubrious: they forebode a glut of tanker tonnage relative to anticipated ANS oil production which will so depress the market that the domestic merchant tanker fleet would unlikely survive the carnage.

Relying upon supporting affidavits submitted with their motions, plaintiffs argue that the Secretary has been led into fundamental misjudgments of fact and policy that public comment would have brought to light;[11] specifically, they contend that the estimates of present costs, charter rates and fuel consumption, as well as predictions of future Alaskan crude oil production found in the Regulatory Impact Analysis ("RIA") of May, 1985, accompanying (but not published with) the payback rule (A.R. 2412–2488), were erroneous and led to grossly overstated estimates of savings that could be expected as a result of the rule. Plaintiffs assert that the Secretary's refusal to reopen the comment period in May, 1985, to allow them to expound upon the changed economic conditions, together with her own reliance on data compiled for her alone after the close of the comment period, violates § 553(c) of the APA. *See International Harvester Co. v. Ruckelshaus,* 478 F.2d 615, 649 (D.C.Cir.1973); *Portland Cement Association v. Ruckelshaus,* 486 F.2d 375, 393 & n. 67 (D.C.Cir. 1973).

As a general proposition, however, a new round of notice and comment is required only where the data relied upon is entirely new and is critical to the agency's determination. *See Community Nutrition Institute v. Block,* 749 F.2d 50, 58 (D.C.Cir. 1984) (distinguishing *Portland Cement, supra* ). Where subsequent studies or information gathered after close of the comment period merely expand upon or confirm earlier studies' conclusions, or enhance the reliability of earlier data, failure to provide an opportunity for comments on such information is not fatal to the rule it purports to underlie. *Id.*

The Secretary maintains that the data she considered was neither "entirely new" nor "critical," and that, as the information went merely to a "predictive judgment" on

---

11. Defendant-intervenors Atlantic Richfield Co., Moore-McCormack Bulk Transport, Inc., and Yeon Shipping Corp. have moved that the affidavits, being *dehors* the administrative record in these cases, be stricken insofar as they attack the merits of the agency action. While it is true that "judicial review of agency action is normally confined to the full administrative record before the agency at the time the decision was made," *Environmental Defense Fund, Inc. v. Costle,* 657 F.2d 275, 284 (D.C.Cir.1981), the Court may use such extra-record evidence not to examine the propriety of the decision itself, but merely as an indication of the sufficiency of the record before the Secretary when she made it. *Id.* at 286. They may be similarly useful to the court of appeals, and the motion to strike is denied.

her part, the Court should defer to her expertise in any event. She also points out that plaintiffs had the right, and ample opportunity, to submit their own up-to-date information under Department of Transportation regulations had they desired to do so, *see* 49 C.F.R. § 5.27, and that other comments were, in fact, received and considered.

It is, however, immediately apparent that the payback rule published in May, 1985, is identical with the rule published in January of 1983 (save for the repayment terms and the one-year time limit), and the reasons given for it are essentially the same reasons advanced in 1983, as illuminated by the comments received. It is, thus, clear that the post-record data, whether right or wrong, did not shape the rule but, as the Secretary suggests, the absence of a rule may have shaped the data.

The rule-making process must end at some point. As the court of appeals stated in *ITOC, supra,* when it last remanded to the agency for a resumption of the rule-making proceedings more than three years ago:

> An agency is not obliged to publish a tentative opinion for comment. Otherwise, an absurd and endless process could [ensue]: notice and comment procedures followed by a tentative opinion followed by comment followed by a new tentative opinion (necessary to take account of and respond to the new set of comments) and so on.

690 F.2d at 926. Moreover, in such rule-making proceedings generally, it is not only entirely permissible for an agency to consult extra-record information to give meaning to that upon which its decisions are based, but

> [i]nterpretation of, and assignment of weight to, data such as these is a task which particularly calls for expert judgment. In interpreting such data and in making predictions based on them, the [agency] must be expected to make use of the experience it has gained through years of dealing with the problem.... Frequently, statistics, scientific reports

and studies will be amenable to various interpretations and effective regulation requires that the [agency] bring to bear the full range of its knowledge, garnered from whatever source, in making the interpretation on which it bases important policy decisions.

*City of Chicago v. FPC,* 458 F.2d 731, 747 (D.C.Cir.1971), *cert. denied,* 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972) (footnote omitted). In such cases, the object of judicial review is simply "to determine whether a reasoned conclusion from the record as a whole could support the premise on which the [agency's] action rests.... [I]n all cases, reasoned conclusions are the hallmark of regularity." *Id.* at 744.

### III.

■ This Court must also add to its legal obligation to refrain from substituting its judgment for that of the Secretary, *see Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971), its recognition of the fact that the genesis of this particular rule is at least as much Executive Branch policy of the current Administration as it is the product of routine regulatory activity. The Secretary acknowledges that CDS repayment "is consistent with this Administration's pro-competitive, anti-regulatory philosophy," 50 Fed.Reg. 19,172, and that "[i]t is this Administration's position that competition should be relied upon whenever feasible to allocate our nation's transportation resources." A.R. at 2433. Thus, it is the President's— not merely an agency's—policy which the payback rule will implement, unless Congress or the courts should gainsay him. And, from the days of the *Seatrain* case all three branches of government have been aware that the prospect of commingling subsidized and unsubsidized vessels in the domestic trade raises issues as complex as the consequences of their resolution are profound; such questions, being matters of national policy, are best answered by the political branches, not the judicial.

Finally, the payback rule has most assuredly not evolved in obscurity. Congress has thrice put the rule on hold, then ultimately allowed its prohibition to lapse. While it is settled wisdom not to attribute more significance to legislative inertia than is wont, congressional inaction in response to an agency's public declaration of what it intends to do with what it believes its statutory authority to be, particularly when Congress is aware of the controversy attending it, gives credence to the supposition that Congress either approves, or is at least willing that the agency be allowed to try what it proposes. *See North Haven Board of Education v. Bell,* 456 U.S. 512, 533–35, 102 S.Ct. 1912, 1924–25, 72 L.Ed.2d 299 (1982); *CBS, Inc. v. Federal Communications Comm'n,* 453 U.S. 367, 382–85, 101 S.Ct. 2813, 2823–25, 69 L.Ed.2d 706 (1981); *Planned Parenthood Fed. of America v. Heckler,* 712 F.2d 650, 660 (D.C.Cir.1983).

The Court concludes that the Secretary's reasoning is clear, whether or not it will prove to have been correct, and that the payback rule rationally follows from that reasoning. It concludes, further, that the rule, its historical origins, and its expected consequences have been sufficiently vexed before the courts, Congress, and the agency for nearly a decade, and that no purpose would be served by a remand for further administrative mastication. What plaintiffs might have told the Secretary about the rule or the post-1983 data in the RIA had she reopened the record as they wished, they have now presented in the context of this proceeding, with no perceptible effect on her thinking. She remains committed to the rule as written, and it is for Congress, if anyone, to require that it be altered.

For the foregoing reasons, therefore, it is, this 25th day of October, 1985,

ORDERED, that plaintiffs' motions for summary judgment are denied; and it is

FURTHER ORDERED, that defendant's and defendant-intervenors' motions for summary judgment are granted; and it is

FURTHER ORDERED, that the complaints are dismissed with prejudice.