58 F.3d 1392
 41 ERC 1207, 32 Fed.R.Serv.3d 774, 25
Envtl. L. Rep. 21,265,
95 Daily Journal D.A.R. 8746
 IDAHO FARM BUREAU FEDERATION, a non-profit corporation;
Idaho Cattle Association, a non-profit
corporation, et al.,
Plaintiffs-Appellees-Cross-Appellants,
v.
Bruce BABBITT, Secretary of Interior, et al., Defendants-Appellees,
and
Idaho Conservation League, Inc., an Idaho non-profit
corporation; Committee for Idaho's High Desert,
Inc., an Idaho non-profit corporation,
Intervenors-Appellants-Cross-Appellees.
 Nos. 94-35164, 94-35230.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 5, 1994.
Decided June 29, 1995.
 
 Scott L. Campbell, and Bobbi K. Dominick, Elam & Burke, Boise, ID, for plaintiffs-appellees-cross-appellants.
 Albert M. Ferlo, Jr., and John L. Marshall, U.S. Dept. of Justice, Washington, DC, for defendants-appellees.
 Laurence J. Lucas, Land & Water Fund of the Rockies, Boise, ID, for intervenors-appellants-cross-appellees.
 Appeals from the United States District Court for the District of Idaho.
 Before: WOOD, Jr.,* HUG, and TANG, Circuit Judges.
 TANG, Senior Circuit Judge:
 
 
 1
 Idaho Conservation League and Committee for Idaho's High Desert ("ICL/CIHD"), intervenors in the district court proceedings, appeal from a district court judgment setting aside the final rule listing the Bruneau Hot Springs Snail as an endangered species. The judgment was entered after a hearing on cross-motions for summary judgment. The district court determined that the listing rule was arbitrary and capricious because the United States Fish and Wildlife Service ("FWS") committed several procedural errors during the period between the initial proposal and the final listing.
 
 
 2
 We conclude that the district court properly granted intervention to ICL/CIHD and that the intervenors have standing to maintain this appeal. On the merits this appeal raises two major issues. First, does the Endangered Species Act ("ESA"), 16 U.S.C. Sec. 1533(b)(6), proscribe listing a species as endangered once the statutory twelve or eighteen month time limits have passed? We conclude that it does not. Legislative history indicates that Congress established time limits to speed up the listing process so that more species would be listed. The time limits were designed as an impetus to act rather than as a bar on subsequent action. Second, did the Secretary of the Interior, acting through FWS, commit procedural errors that require setting aside the rule listing the Springs Snail as an endangered species? We conclude that the Secretary should have provided the public with the USGS report, along with an opportunity to comment on the report. The report contained key data on which FWS relied, data that was not merely cumulative or responsive to other comments. FWS satisfied the remaining procedural requirements.
 
 
 3
 We vacate the judgment of the district court and remand the cause to the district court for remand to FWS. The agency must provide the public with notice and an opportunity to comment on the USGS report. The public also must be given the opportunity to submit any other information relevant to the listing decision. Thereafter, FWS must review the record in its entirety and decide whether to list the Springs Snail as an endangered species.
 
 
 4
 The Bruneau Hot Springs Snail is a species of very small snails first identified in the early 1950's. Thus far, the species has been found only in a narrow band of thermal springs and seeps along a 5.28 mile stretch of the Bruneau River and a tributary, Hot Creek, in Owyhee County in southwest Idaho. Government agencies and other researchers have been unsuccessful in their attempts to locate other Springs Snail habitat. On August 21, 1985, FWS published a proposal to list the snail as an endangered species. 50 Fed.Reg. 33,803 (1985). The proposal was made under the Endangered Species Act ("ESA"), 16 U.S.C. Sec. 1533. At that time, the Springs Snail was known to exist only in two springs in the Bruneau River area. According to FWS, a declining water table, resulting from ground water pumping, had reduced the springs' flow to less than ten percent of the 1954 flow. Reduced habitat due to the lower spring flow posed the primary threat to the Springs Snail. Id. at 33,803-05.
 
 
 5
 Initially, FWS provided a sixty-day comment period, from August 21 to October 21, 1985. FWS also published notice of the proposal in the Idaho Statesman, a newspaper serving southwest Idaho. Responding to a request for a public hearing, FWS set an additional comment period, from October 31 to December 31, 1985. 50 Fed.Reg. 45,443 (1985). FWS held one public hearing in Boise on December 10, 1985, and a second public hearing on January 15, 1986, near Bruneau. FWS also extended the comment period through February 1, 1986. 50 Fed.Reg. 51,894 (1985).
 
 
 6
 In December of 1986, over sixteen months after the initial notice, FWS announced that there was substantial disagreement in the data regarding the status of the Springs Snail and extended the period of consideration for six months. 51 Fed.Reg. 47,033 (1986). FWS set another period of public comment from December 30, 1986, to February 6, 1987.
 
 
 7
 One year later, by letter dated February 23, 1988, the United States Senators for Idaho, James McClure and Steve Symms, wrote the FWS director and asked that he not proceed with listing the Springs Snail. The Senators expressed concern that the listing could have "devastating effects" on the local agricultural community and added that "listing would be meaningless to protection of the snail's natural habitat if the hydrologic cause of the habitat's decline is not fully understood." They urged FWS to determine the connection between pumping of the aquifer and decreasing water levels in the Indian Bathtub spring, and to determine whether Springs Snails existed in other springs. The Senators added that they would assist in securing the funding necessary to conduct further studies. The FWS director agreed to delay listing the Springs Snail pending funding of conservation activities that might eliminate the need for an ESA listing.
 
 
 8
 Thereafter Congress provided FWS with $400,000 in funding for two additional studies. One study conducted by Idaho State University (ISU) and completed in May, 1992, found 126 previously unknown colonies of Springs Snails in spring and seep sites along a 5.28 mile section of the Bruneau River. The study stated that because information provided by the United States Geological Survey indicated that all springs in the area arise from a common aquifer, the threat to the species posed by depletion of the aquifer was not reduced by finding additional snail colonies in those springs.
 
 
 9
 A second study, conducted by the United States Geological Survey ("USGS"), analyzed the hydrology of the geothermal system in the Bruneau River valley to determine the cause of declining spring flows. A provisional draft was completed in 1992. USGS gave FWS the draft but did not release the report to the public. The provisional draft is contained in the administrative record. Nonetheless, the record indicates the public did not have access to the report. Idaho Farm Bureau ("IFB") attorney Scott Campbell's affidavit states Campbell asked Duke for the report, but Duke stated he could not provide a copy until it was published. Furthermore, although both the October, 1992, and December, 1992, notices in the Federal Register mention that Congress funded the USGS study, these notices neither discuss the results of the study nor provide a citation for it. 57 Fed.Reg. 45,762, 45,763 (1992); 57 Fed.Reg. 60,160, 60,161 (1992).
 
 
 10
 In addition to the studies funded by Congress, the Idaho Department of Water Resources ("IDWR"), the state agency charged with administering water rights in Idaho, conducted a third study. In its comments to FWS, IDWR recommended that the Springs Snail not be listed as endangered. IDWR asserted that no available evidence indicates that groundwater pumping uniformly affects the 126 springs and pools that constitute Springs Snails' habitat.
 
 
 11
 By 1992, FWS still had not made a final decision on the proposed listing. In July, 1992, Idaho Conservation League and Committee for Idaho's High Desert ("ICL/CIHD") (intervenors-appellants in the present action), filed suit to compel a final ruling on the proposed listing. On November 24, 1992, the district court approved a settlement in that action. In the settlement, FWS committed to rendering a final decision on the Springs Snail listing proposal by January 15, 1993 and publishing the decision by February 1, 1993.
 
 
 12
 After the suit had been filed, FWS set another public comment period from October 5, 1992 through November 4, 1992, to provide the public an opportunity to submit any additional new information. 57 Fed.Reg. 45,762 (1992). The notice in the Federal Register explained that Congress had funded the ISU and USGS studies, but this notice did not provide a citation for the USGS study. Id. at 45,763. FWS did not publish notice of the new comment period in the Idaho Statesman until November 6, 1992, two days after the comment period closed. Therefore, FWS held another comment period from December 18, 1992, through December 28, 1992, and published the required notice in the Federal Register and the Idaho Statesman. 57 Fed.Reg. 60,160 (1992). FWS still did not provide a citation to the USGS study.
 
 
 13
 FWS issued its final rule listing the Springs Snail as an endangered species on January 25, 1993, seven and one-half years after FWS first proposed the listing on August 21, 1985. 58 Fed.Reg. 5938 (1993). FWS concluded that the Springs Snail risks extinction because agricultural ground water withdrawal has depleted the geothermal aquifer in the Bruneau area, thereby reducing or eliminating the springs constituting Springs Snail habitat.
 
 
 14
 Idaho Farm Bureau Federation ("IFB") filed a complaint for declaratory and injunctive relief against the Secretary of the Interior and the FWS national director, regional director and Boise field supervisor. On cross-motions for summary judgment, the district court set aside the FWS final rule listing the Springs Snail as an endangered species. The court found the listing to be arbitrary and capricious because FWS had committed a number of procedural violations in the course of listing the Springs Snail. Idaho Farm Bureau Federation v. Babbitt, 839 F.Supp. 739, 752 (D.Idaho 1993). ICL/CIHD appeal the district court judgment.
 
 
 15
 I. Did the district court err in granting ICL/CIHD's application to intervene under Fed.R.Civ.P. 24?
 
 
 16
 The first two issues we address on appeal were raised by IFB in a cross-appeal. Because these two issues are jurisdictional, we address them before considering the merits.
 
 
 17
 The appellants, ICL/CIHD, were intervenors in the district court proceedings on the side of the defendants, (collectively "FWS"). We begin by considering whether the district court erred in granting ICL/CIHD's motion to intervene as of right.[1] Federal Rule of Civil Procedure 24(a)[2] establishes four requirements for intervention as of right: "timeliness; an interest relating to the subject of the action; practical impairment of the party's ability to protect that interest; and inadequate representation by the parties to the suit." United States v. Oregon, 913 F.2d 576, 587 (9th Cir.1990), cert. denied, Makah Indian Tribe v. United States, 501 U.S. 1250, 111 S.Ct. 2889, 115 L.Ed.2d 1054 (1991). The rule is construed broadly in favor of the applicants. Id. We review an intervention decision de novo, with the exception of timeliness, which we review for abuse of discretion. Id.
 
 
 18
 In evaluating timeliness, we consider the stage of the proceeding, prejudice to other parties, and the reason for and length of the delay. Id. at 588. ICL/CIHD filed the motion to intervene in September, 1993, four months after IFB filed the action in May, 1993. FWS filed an answer and submitted the administrative record in July, 1993. No other activity occurred until August 12, when IFB filed a motion for a preliminary injunction. ICL/CIHD moved to intervene prior to the hearing on the preliminary injunction motion. The intervention motion was filed at a very early stage, before any hearings or rulings on substantive matters. Furthermore, IFB does not contend that the intervention was prejudicial. The district court's determination that the motion for intervention was timely does not constitute an abuse of discretion.
 
 
 19
 The conservation groups also have an interest relating to the subject of the present litigation. A public interest group is entitled as a matter of right to intervene in an action challenging the legality of a measure it has supported. Sagebrush Rebellion, Inc. v. Watt, 713 F.2d 525, 527 (9th Cir.1983); Washington State Bldg. & Constr. Trades Council v. Spellman, 684 F.2d 627, 630 (9th Cir.1982), cert. denied, Don't Waste Washington Legal Defense Foundation v. Washington, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983). In Sagebrush Rebellion, the party that was granted intervention, National Audubon Society, had participated in the administrative process the Interior Secretary followed to establish a conservation area for birds of prey. 713 F.2d at 526-27. Similarly, ICL/CIHD have been active in the process FWS went through to list the Springs Snail as an endangered species. The groups even filed a suit to compel FWS to make a final decision on the proposed listing rule. ICL/CIHD satisfy the interest requirement.[3]
 
 
 20
 Looking to the third requirement, we conclude that disposition in the present action would impair ICL/CIHD's ability to protect their interest in the Springs Snail and its habitat. The action could, and did, lead to a decision to remove the Springs Snail from the list of endangered species. Cf. Sagebrush Rebellion, 713 F.2d at 528 (granting intervention and stating that a decision to set aside agency action creating conservation area for birds of prey would impair Audubon Society's interest in preservation of birds and their habitat).
 
 
 21
 Finally, we assess the fourth requirement, adequacy of representation, by determining whether the party on whose side the applicant seeks intervention is capable of and willing to make the intervenor's arguments. Sagebrush Rebellion, 713 F.2d at 528. FWS delayed its decision on the listing proposal for years and took action only after ICL/CIHD filed suit to compel FWS to make a decision. FWS was unlikely to make strong arguments in support of its own actions considering that it proceeded to make a decision largely to fulfill the settlement agreement in the suit ICL/CIHD filed. Furthermore, FWS was unlikely to argue on behalf of ICL/CIHD, the very organizations that compelled FWS to make a final decision by filing a lawsuit. FWS would not have adequately represented ICL/CIHD's interests.[4]
 
 
 22
 II. Do ICL/CIHD have standing to bring this appeal?
 
 
 23
 FWS did not appeal the district court's decision to set aside the final listing rule. Absent appeal by FWS, the intervenors must have standing in order to pursue this appeal. Didrickson v. United States Dep't of the Interior, 982 F.2d 1332, 1337-38 (9th Cir.1992) (citing Diamond v. Charles, 476 U.S. 54, 68, 106 S.Ct. 1697, 1706, 90 L.Ed.2d 48 (1986)). The intervenors must satisfy three requirements to establish standing under Article III. First, the intervenors must show that they have suffered an injury in fact, " 'an invasion of a legally-protected interest' that is concrete and particularized, and actual or imminent." Didrickson, 982 F.2d at 1340 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1991)).
 
 
 24
 Intervenors in environmental litigation satisfy the injury in fact requirement by showing that group members have direct contact with the environmental subject matter threatened by an adverse decision. Didrickson, 982 F.2d at 1340. In Didrickson, intervenors appealed a district court decision that struck down an FWS regulation protecting Alaskan sea otters. The intervenors satisfied the injury in fact requirement by demonstrating that their members, Alaska residents, study, observe, and enjoy the otters in specific regions of Alaska. Id. at 1340-41. In Seattle Audubon Soc'y v. Espy, 998 F.2d 699, 702-703 (9th Cir.1993), the Audubon Society, which challenged the Forest Service's management plan for spotted owl habitat, satisfied the injury in fact requirement by describing the frequency with which its members visit owl-inhabited forests, their proximity to such forests, and their aesthetic and scientific interest in the owl.
 
 
 25
 In the case before us, intervenors ICL/CIHD have demonstrated injury in fact. At least some members of both ICL and CIHD live in Idaho. Members of both organizations visit the Bruneau Valley area in which the Springs Snail is found. The ICL director has visited Indian Bathtub, one of two springs in which the snail was originally discovered, and the surrounding area. ICL members also maintain a factual and scientific understanding of the Springs Snail, its habitat, and threats to the species.
 
 
 26
 In addition to injury in fact, an intervenor seeking to establish standing under Article III must show a causal connection between the injury and the conduct complained of--the injury must be fairly traceable to the challenged action. Seattle Audubon Soc'y, 998 F.2d at 702. Finally, the intervenors must show that the injury will likely be redressed by the relief requested. Id. Intervenors occupy a unique position with respect to satisfying these two requirements. To obtain standing on appeal, an intervenor need not show that the intervenor could have sued the party who prevailed in district court. Didrickson, 982 F.2d at 1338. Intervenors can allege a threat of injury stemming from the order they seek to reverse, an injury which would be redressed if they win on appeal. Yniguez v. Arizona, 939 F.2d 727, 731-32 (9th Cir.1991). Applying these standards, ICL/CIHD easily satisfy the two additional standing requirements. The injury to ICL/CIHD, the potential threat of harm to the Springs Snail, is "traceable" to the district court order setting aside the endangered species listing. This injury would be redressed if the listing is put back into place.
 
 
 27
 The district court appropriately granted intervention and the intervenors have standing on appeal. We proceed to consider the merits of this action.
 
 
 28
 III. Does the Endangered Species Act prohibit the Secretary from listing any species as endangered more than eighteen months after the listing is first proposed?
 
 
 29
 FWS listed the Springs Snail as an endangered species well past the eighteen month time requirement set forth in the ESA. We must determine whether the ESA, 16 U.S.C. Sec. 1533(b)(6), proscribes listing a species as endangered once the statutory time limits have passed. We interpret the statutory provisions of the ESA de novo. United States v. City of Rancho Palos Verdes, 841 F.2d 329, 330 (9th Cir.1988).[5]
 
 
 30
 The ESA imposes specific deadlines on the Secretary for acting on a proposal to list a species. Within one year of publishing a proposed listing rule, the Secretary "shall" publish either a final listing rule, notice that the proposed rule is being withdrawn on grounds of insufficient evidence, or notice that the one-year period is being extended by six months to gather additional data because there is substantial disagreement regarding the existing data relevant to the listing determination. 16 U.S.C. Sec. 1533(b)(6)(A)(i)(I)-(IV), (b)(6)(B)(i)-(ii).[6] If the Secretary extends the decision by six months, he "shall" publish at the end of the six months either the rule or a notice withdrawing the rule, together with the finding on which withdrawal is based. 16 U.S.C. Sec. 1533(b)(6)(B)(iii).[7]
 
 
 31
 Although the statutory term "shall" suggests that the limits are mandatory, failure of an agency to act within a statutory time frame does not bar subsequent agency action absent a specific indication that Congress intended the time frame to serve as a bar. Brock v. Pierce County, 476 U.S. 253, 260-265, 106 S.Ct. 1834, 1839-1842, 90 L.Ed.2d 248 (1986). In Brock, the Supreme Court concluded that a provision of the Comprehensive Employment and Training Act, 29 U.S.C. Sec. 816(b), requiring the Labor Secretary to act on a complaint about misuse of grant funds within 120 days, did not divest the Secretary of jurisdiction to act after that time. Id. at 266, 106 S.Ct. at 1842. The Supreme Court based its decision on several factors: legislative history did not indicate that Congress designed the time requirements to bar subsequent action; the statute did not prescribe consequences for failure to act within the time frame; and a less drastic remedy, a suit to compel agency action, was available. Id. at 259-263, 106 S.Ct. at 1838-1841. The Court concluded that the 120 day requirement was intended to be an impetus to act rather than a limitation on the Secretary's authority to act. Id. at 265, 106 S.Ct. at 1841. See also Saratoga Sav. and Loan Ass'n v. Federal Home Loan Bank Bd., 879 F.2d 689, 694 (9th Cir.1989) (board did not lose jurisdiction for failure to comply with ninety day deadline for rendering a decision).
 
 
 32
 Legislative history accompanying the 1982 amendments to the ESA indicates that Congress passed the amendments due to concern about the low number of additions to the list of endangered species. "The Endangered Species Act was enacted in 1973 as a response to mounting concern over the extinction of fish, wildlife, and plants in the United States." H.R.Rep. No. 567, 97th Congress, 2d Sess., reprinted in 1982 U.S.C.C.A.N. 2807, 2809. In evaluating the ESA, "[o]ne of the principal problems noted was the decline in the pace of listing species which has occurred in recent years. Since 1981, only two species have passed through the entire proposal and listing processes." Id. at 2811.
 
 
 33
 In response, Congress attempted to find ways to expedite listing endangered species. "These amendments are intended to expedite the decisionmaking process and to ensure prompt action in determining the status of the many species which may require the protections of the Act." H.R.Conf.Rep. No. 835, 97th Congress, 2d Sess., reprinted in U.S.C.C.A.N. 2807, 2860. As one means of expediting the listing process, Congress shortened the time frames for action. "To ensure that proposals ... are acted upon quickly, the Committee adopted a provision, new section 4(b)(6)(A), to shorten the allowable time for final action on section 4 proposals to list or delist a species from 2 years to one year from date of proposal." Id. at 2864. "Unless explicitly qualified, the time periods set forth in section 4, as amended, must be strictly adhered to by the Secretary." Id.
 
 
 34
 The legislative history's emphasis on the importance of the time limitations must be interpreted in light of the purpose of the amendments--to facilitate addition of endangered species to the endangered species list. A conclusion that the Secretary is prohibited from acting after passage of the prescribed time requirements would be inconsistent with this purpose. As in Brock, the time requirements are designed to be an impetus to act rather than a prohibition on action taken after the time expires. Therefore, the Secretary can still list a species after expiration of the eighteen month statutory time requirement.
 
 
 35
 Our conclusion is bolstered by the fact that, like the statute in Brock, the ESA does not provide any consequences for failure to act within the prescribed time. Further, the ESA provides a less drastic remedy--IFB could have filed a citizen suit to compel a decision.[8] The availability of citizen suits makes it even less likely that Congress intended to create the more drastic remedy of revoking agency listing authority after passage of time requirements. See Brock, 476 U.S. at 260, 106 S.Ct. at 1839; see also Linemaster Switch Corp. v. EPA, 938 F.2d 1299, 1304 (D.C.Cir.1991). Considering these factors together, the ESA did not preclude the FWS from listing the Springs Snail as an endangered species even after the eighteen month time requirement had passed.
 
 
 36
 We are well aware that the period between the initial proposed listing and the final listing, seven years, is exceptionally long. Such passage of time is a disservice to potentially endangered species and to the public. However, we also recognize that FWS faced a situation not anticipated in the standard listing process established in the ESA. Idaho's senators asked FWS to delay the listing, at least until FWS determined the cause of decline in Springs Snail habitat. The Senators agreed to help obtain the funding necessary to conduct additional studies. Congress thereafter provided funding for two separate studies. As long as FWS followed the mandated procedures after obtaining the studies, the passage of time does not render FWS's conduct arbitrary and capricious. We now consider whether FWS followed the required procedures.
 
 
 37
 IV. Should the rule listing the Springs Snail be set aside due to procedural violations?
 
 
 38
 The district court set aside the final rule listing the Springs Snail as an endangered species, concluding the listing was arbitrary and capricious because FWS had committed a number of procedural violations. We review the district court's grant of summary judgment de novo. F.D.I.C. v. New Hampshire Ins. Co., 953 F.2d 478, 485 (9th Cir.1991). We review the rule listing the Springs Snail in accordance with the Administrative Procedure Act ("APA"). The APA provides that final agency action shall be held unlawful and set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or if it was taken "without observance of procedure required by law." 5 U.S.C. Sec. 706(2)(A), (D). See also Rybachek v. EPA, 904 F.2d 1276, 1284 (9th Cir.1990).
 
 
 39
 The APA requires an agency to publish a general notice of proposed rule making in the Federal Register, "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation," and, "after consideration of the relevant matter presented," "incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. Sec. 553(b)-(c). The ESA imposes additional procedural requirements for proposals to list species as endangered. At least ninety days before the effective date of the regulation, the Secretary must publish notice and the complete text of the proposed regulation in the Federal Register, and give actual notice of the proposed regulation to the State agency and the county in each State in which the species is believed to exist. 16 U.S.C. Secs. 1533(b)(5)(A)(i)-(ii). The Secretary also must publish a summary of the proposed regulation in a newspaper in each area in which the species is believed to exist, and promptly hold one public hearing on the proposed regulation if any person files a request. 16 U.S.C. Secs. 1533(b)(5)(D), (E).
 
 A. Reliance on the USGS Study
 
 40
 First we determine whether FWS violated the APA notice and comment provisions by failing to make the provisional USGS report available to the public before the close of the final comment period. FWS refers to this report extensively in the supplemental information accompanying the final listing rule.
 
 
 41
 There is some dispute in the record as to whether the USGS report was available to the public. In an affidavit, FWS employee Steven Duke explains that the USGS provisional draft was included in the public files of documents concerning the Springs Snail listing decision at the Boise FWS field office. Duke states that FWS received the report in October, 1992. According to Duke, FWS did not distribute the report because USGS had provided only a provisional report and had requested that FWS not copy and distribute this report until USGS published the final version. However, Duke's record of a telephone conversation between Duke and a newspaper reporter, dated November 24, 1992, indicates that the USGS report was not available at the Boise office. IFB attorney Scott Campbell's affidavit states Campbell asked Duke for the report, but Duke stated he could not provide a copy until it was published.
 
 
 42
 Other information of record also indicates that the report was not available to the public. Although both the October 1992 and December 1992 notices in the Federal Register mention that Congress funded the USGS study, these notices neither discuss the results of the study nor provide a citation for it. See 57 Fed.Reg. 45,762, 45,763 (1992); 57 Fed.Reg. 60,160, 60,161 (1992). In contrast, both notices cite and briefly discuss the results of the ISU report. Several of the public comments filed in December 1992 complained that the USGS report had not been released. Based on the information in the record, we conclude that the USGS report was not available to the public at the time that FWS made the final listing decision.
 
 
 43
 An agency can add material to the administrative record after the close of a public comment period when that material is a response to the comments. Rybachek, 904 F.2d at 1286. Rybachek does not discuss the nature of the responsive information. An agency may use " 'supplementary' data, unavailable during the notice and comment period, that 'expand[s] on and confirm[s]' information contained in the proposed rulemaking and addresses 'alleged deficiencies' in the pre-existing data, so long as no prejudice is shown." Solite Corp. v. EPA, 952 F.2d 473, 484 (D.C.Cir.1991) (quoting Community Nutrition Inst. v. Block, 749 F.2d 50, 57-58 (D.C.Cir.1984)). In Solite, the EPA replaced one report with a later report as the source of data on which final quantitative measurements were based. 952 F.2d at 484. The D.C. Circuit held that EPA had not violated notice and comment provisions. The new data enabled EPA to respond to concerns and confirm prior calculations. Further, the methodology used to analyze the data remained constant. Id. at 485. See also Block, 749 F.2d at 57-58 (no violation of notice and comment requirements when unavailable supplemental studies were a response to comments which discussed a methodological flaw in prior studies).
 
 
 44
 The USGS study did not merely supplement or confirm existing data. In the original notice of the proposed listing in 1985, FWS claimed that Springs Snail habitat was declining because of "reduced spring flows caused by draw-down of the water table by ground water pumping for agricultural and other uses." 50 Fed.Reg. 33,803 (1985). FWS referenced studies that indicated the spring flow had decreased to less than 10% of the 1954 levels, but offered no supporting data regarding the cause of the decline. Id. at 33,804. Congress funded the USGS study because of concern, as expressed by Idaho's Senators, about the lack of data on the hydrologic cause of the reduced spring flows. The USGS study did not confirm or replace existing data on the cause of declining water levels.
 
 
 45
 ICL/CIHD argue that ample data in the administrative record indicates that the Spring Snail's habitat is threatened because spring flows have greatly reduced. The original 1985 notice mentions three studies on this very point. 50 Fed.Reg. at 33,804. If FWS had used the USGS study only to indicate that spring flows had decreased, then the study would be merely supplemental. However, as discussed, the USGS study provided the only scientific information on the cause of the decline in spring flows. The USGS study provided unique information that was not duplicated in other reports.
 
 
 46
 Furthermore, the necessity for notice and opportunity to comment on the USGS study was greatly heightened because FWS relied largely on the USGS study to support its final rule. In Block, the D.C. Circuit Court of Appeals found no violation of notice and comment requirements because, in part, the unavailable supplemental studies did not provide new information that was " 'critical' " to the agency's determination. 749 F.2d at 57-58 (citing Portland Cement Ass'n v. Ruckelshaus, 486 F.2d 375, 393 (D.C.Cir.1973), cert. denied, Portland Cement Corp. v. EPA, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974)). In contrast, the USGS report was critical to FWS' decision to list the Springs Snail. In the supplemental information accompanying the final listing of the Springs Snail, FWS supports its key analysis by citing the USGS study. FWS states that "[t]he major threat to the Bruneau Hot Springsnail is the reduction or reduced water levels in thermal spring habitats from groundwater withdrawal/mining of the regional geothermal aquifer system," and cites the USGS study for support. 58 Fed.Reg. 5938, 5939 (1993).[9] FWS also relied on the USGS study to explain that the Springs Snail needed to be listed even though the 1992 ISU study had located 126 additional springs or seeps containing the snails. FWS stated, "[T]hese newly discovered springsnail populations and their habitats are as threatened by continuing declines in Bruneau valley spring discharges as the remaining Hot creek populations" because "all thermal springs along this reach of river arise from a single regional geothermal aquifer." Id. at 5940 (citing USGS study).
 
 
 47
 Opportunity for public comment is particularly crucial when the accuracy of important material in the record is in question. See Solite, 952 F.2d at 484; Block, 749 F.2d at 58. The validity of the USGS report on which FWS relied is questionable because the report was a "provisional draft" that USGS did not want released to the public. Furthermore, IDWR reviewed the provisional draft and discovered errors in the recharge calculations. ICL/CIHD explain that the error in calculation was minor. Nonetheless, USGS revised the provisional draft after IDWR pointed out the errors. The provisional draft should have been available for public review so that its accuracy could have been verified before the FWS made a decision relying, to a large extent, on information contained in the report.
 
 
 48
 The USGS report was central to the Secretary's decision to list the Springs Snail as an endangered species. This report provided the only information on the cause of decline in the spring flow, but the report was only a provisional draft and therefore concerns exist regarding its validity. By failing to provide the public with an opportunity to review the USGS report in these circumstances, FWS made its listing decision "without observance of procedure required by law." 5 U.S.C. Sec. 706(2)(D). At a minimum, FWS must provide an opportunity for public comment on the final USGS report and reconsider its listing decision thereafter. We now consider whether FWS made other procedural errors.
 
 
 49
 B. Adequacy of Opportunity for Public Comment
 
 
 50
 The next procedural issue is whether FWS provided adequate opportunity for the public to comment on the Springs Snail listing, aside from the failure to make the USGS report available. The purpose of the notice and comment requirement is to provide for meaningful public participation in the rule-making process. See Rybachek, 904 F.2d at 1286; Washington Trollers Ass'n v. Kreps, 645 F.2d 684, 686 (9th Cir.1981). FWS set several periods of public comment, including two public hearings, during August 1985 to February 1987. A five and one-half year gap followed, in which Congress funded the USGS and ISU studies. In response to the lawsuit to compel action, FWS opened additional periods for public comment in October and December 1992.
 
 
 51
 Although the public comments obtained during 1985 through 1987 are part of the record, we determine the adequacy of the comment period by looking to the comment periods provided in late 1992. After a gap of nearly six years, the public may have new or different information to offer for consideration, particularly given rapid advances in scientific knowledge. The Secretary also may have new information. The opportunity to participate is not meaningful unless it occurs reasonably close to the time in which the Secretary makes a decision.
 
 
 52
 The need for public comment close to the period of decision is particularly evident in the present case. Although the proposed rule to list the Springs Snail did not change after the five and one-half year gap, the basis for the proposed rule changed significantly. Congress funded two major studies to gather information on the Spring Snail's current location and status, and on the hydrological conditions in the area. FWS acknowledged it needed to consider "any additional new information" in order "to ensure the accuracy of any final decision concerning the appropriateness of listing." 57 Fed.Reg. 45,762, 45,762-63 (Oct. 5, 1992). The public needed the opportunity to comment on the new studies.
 
 
 53
 The administrative record indicates that, apart from the USGS report, FWS provided adequate opportunity to comment on the listing proposal in 1992. The APA does not set a minimum length of time for public comment. FWS provided a public comment period from October 5, 1992 through November 4, 1992. 57 Fed.Reg. 45,762 (1992). Because notice of this period was not published in the Idaho Statesman until November 6, 1992, two days after the close of the comment period, FWS held another comment period from December 18, 1992, through December 28, 1992. 57 Fed.Reg. 60,160 (1992). FWS received sixty-two comments during the final ten day period. Many of these comments discuss the ISU study, indicating that the public had obtained and reviewed this study. A number of the comments also express frustration that the USGS study was not available. The public seemed well aware of the proposed listing and the available supporting data. Thus, the comment period was adequate.
 
 
 54
 C. Adequacy of Response to the Public Comments
 
 
 55
 IFB claims that the Secretary did not adequately respond to the comments made in December, 1992. An agency need only respond to "significant comments," those which, "if adopted, would require a change in the agency's proposed rule." American Mining Congress v. EPA, 965 F.2d 759, 771 (9th Cir.1992). On December 9, 1992, the FWS field office sent the regional FWS director a copy of the final rule and a recommendation to list the Springs Snail as endangered. The final comment period had not yet begun. However, preparation and circulation of a draft of the final rule does not, in and of itself, indicate that FWS failed to consider and respond to comments offered after the draft was prepared. The order entered pursuant to settlement in the suit to compel FWS to act required FWS to publish its decision by February 1, 1993. To meet this deadline, FWS appropriately arrived at a tentative conclusion about its likely course of action. The tentative conclusion was not irreversible.
 
 
 56
 Review of the comments filed in December indicates that the agency did respond adequately. IDWR and Dr. Leland Mink submitted two of the most substantive comments. IDWR and others commented on the ISU study that had located 126 additional seeps and springs serving as Springs Snail habitat, and suggested that the snail did not need to be listed. FWS replied that listing was still justified because the snail is endemic to a small 5.28 mile area and is "dependent upon thermal springflows originating from a common groundwater source." 58 Fed.Reg. at 5940. Dr. Mink and IDWR commented on the need for more study on the hydrology of the area. FWS responded with the results of the USGS report. Id. at 5940-41. A significant percentage of the other comments raised economic concerns. FWS replied that the ESA, Sec. 1533(b)(1)(a), precludes consideration of economic factors during the listing process. Id. at 5942. None of the comments contained studies contradicting those relied on by FWS. The only comments to which FWS did not respond were those complaining about lack of opportunity to review the USGS study. Apart from the complaint about the USGS study, the agency adequately responded to public comments.
 
 
 57
 D. Failure to Provide Notice to Owyhee County Commission
 
 
 58
 The ESA requires that FWS give "actual notice of the proposed regulation ... to each county ... in which the species is believed to occur...." 16 U.S.C. Sec. 1533(b)(5)(A)(ii). ICL/CIHD do not dispute that FWS did not provide the Owyhee County Commissioner actual notice, although the supplemental information to the final rule states that appropriate county governments were contacted. 58 Fed.Reg. at 5940. ICL/CIHD claim the error is harmless.
 
 
 59
 The APA requires courts to take " 'due account' " of harmless error. Riverbend Farms, Inc. v. Madigan, 958 F.2d 1479, 1487 (9th Cir.1992) (quoting 5 U.S.C. Sec. 706), cert. denied, --- U.S. ----, 113 S.Ct. 598, 121 L.Ed.2d 535 (1992). Failure to provide notice and comment is harmless when the agency's mistake had no bearing on the procedure used or the substance of the decision. Id. Owyhee County Commissioner Don Davis presented a petition opposing the listing at the public hearing in Boise on December 10, 1985. FWS held the next public hearing in Owyhee County on January 15, 1986. Commissioner Davis testified at this hearing on his own behalf. Thus, it appears that the commissioners were aware of the early hearings even without individual notice to the County. Although the record does not indicate the Commissioners had notice of the 1992 hearings, FWS published notice of the final hearing in the Federal Register and the Idaho Statesman. Therefore, the failure to provide direct notice to the County constitutes harmless error.
 
 V. Conclusion
 
 60
 Failure to provide the public with an opportunity to review the USGS report constitutes a significant procedural error on the Secretary's part. Ordinarily when a regulation is not promulgated in compliance with the APA, the regulation is invalid. Western Oil and Gas v. EPA, 633 F.2d 803, 813 (9th Cir.1980). However, when equity demands, the regulation can be left in place while the agency follows the necessary procedures. Id. See also Fertilizer Institute v. EPA, 935 F.2d 1303, 1312 (D.C.Cir.1991). In the present case, concern exists regarding the potential extinction of an animal species. No one disputes that the spring flow in the only springs known to constitute Springs Snail habitat has greatly reduced. The record indicates that Indian Bathtub, one of two original springs in which the Springs Snail was found, is completely dry. In addition, the significant expenditure of public resources, including the $400,000 spent on the ISU and USGS studies, would be unnecessarily wasted if we affirm the decision to set aside the listing rule when a more closely tailored remedy is available. The equitable concerns weigh toward leaving the listing rule in place while FWS remedies its procedural error and considers anew whether to list the Springs Snail.
 
 
 61
 On remand, the Secretary must remedy its failure to make the USGS study available for comment. The Secretary can remedy this error by providing the public with notice and a period in which to comment on the USGS study. The Secretary should also provide the public with any other new information he plans to consider. The public can also submit any other information relevant to determining whether the Springs Snail should be listed as endangered. Thereafter the Secretary must make a listing determination, considering the record in its entirety. Interim reinstatement of the rule should not factor into the Secretary's decision on whether to list the Springs Snail as endangered.
 
 
 62
 The district court's judgment is VACATED and the cause REMANDED for further proceedings consistent with this opinion.
 
 
 
 *
 Honorable Harlington Wood, Jr., Senior Circuit Judge for the Seventh Circuit, sitting by designation
 
 
 [1]
 The question of intervention is jurisdictional in this case because only the intervenors appeal the district court judgment. If intervention was not properly granted, ICL/CIHD cannot appeal as intervenors
 
 
 [2]
 Rule 24(a) provides:
 Upon timely application anyone shall be permitted to intervene in an action: ... (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.
 
 
 [3]
 IFB argues that the conservation groups do not have standing because the action is a challenge to the procedure utilized to enact the listing rule rather than a challenge to the substance of the rule. However, the argument they raise is really one regarding intervention. In the case on which IFB relies, Wade v. Goldschmidt, 673 F.2d 182, 185 (7th Cir.1982), the Seventh Circuit concluded that proposed intervenors could not intervene in litigation challenging governmental bodies' compliance with procedural statutes. The Seventh Circuit stated that only the governmental bodies could be defendants. Id. We need not determine whether Wade is consistent with Ninth Circuit standards for intervention as of right because the present case differs from Wade. In the district court proceedings, the IFB challenged both the substantive listing rule and the procedures FWS followed. Thus, ICL/CIHD were not seeking intervention in a case challenging only agency procedure
 
 
 [4]
 The district court granted ICL/CIHD both intervention as of right and permissive intervention. Because we conclude that the intervenors were entitled to intervene as of right, we need not address whether the district court appropriately granted permissive intervention
 
 
 [5]
 ICL/CIHD argue that the district court failed to give deference to the Secretary's interpretation of the ESA. IFB moves to strike this argument, as well as a General Accounting Office ("GAO") report attached to the reply brief. We decline to rule on the motion to strike because our decision would be the same with or without inclusion of the disputed material. See Reebok Int'l, Ltd. v. Marnatech Enterprises Inc., 970 F.2d 552, 556 n. 4 (9th Cir.1992). The record does not indicate that the Secretary interpreted the ESA in the manner that ICL/CIHD suggest. ICL/CIHD argue that the GAO report, which indicates that a percentage of endangered species listings occurred after the statutory deadline had passed, establishes that the Secretary interpreted the ESA as allowing listings after eighteen months. However, the statistics merely indicate the point at which the Secretary acted, not the reason why the Secretary believed it could act. The record does not indicate that the Secretary interpreted the ESA in the manner suggested by ICL/CIHD
 
 
 [6]
 The relevant portions of 16 U.S.C. Sec. 1533(b)(6) provide:
 (A) Within the one-year period beginning on the date on which general notice is published ... regarding a proposed regulation, the Secretary shall publish in the Federal Register--
 (i) if a determination as to whether a species is an endangered species or a threatened species, or a revision of critical habitat, is involved, either--
 (I) a final regulation to implement such determination,
 (II) a final regulation to implement such revision or a finding that such revision should not be made,
 (III) notice that such one-year period is being extended under subparagraph (B)(i), or
 (IV) notice that the proposed regulation is being withdrawn under subparagraph (B)(ii), together with the finding on which such withdrawal is based....
 (B)(i) If the Secretary finds with respect to a proposed regulation referred to in subparagraph (A)(i) that there is substantial disagreement regarding the sufficiency or accuracy of the available data relevant to the determination or revision concerned, the Secretary may extend the one-year period specified in subparagraph (A) for not more than six months for purposes of soliciting additional data.
 (ii) If a proposed regulation referred to in subparagraph (A)(i) is not promulgated as a final regulation within such one-year period (or longer period if extension under clause (i) applies) because the Secretary finds that there is not sufficient evidence to justify the action proposed by the regulation, the Secretary shall immediately withdraw the regulation. The finding on which a withdrawal is based shall be subject to judicial review. The Secretary may not propose a regulation that has previously been withdrawn under this clause unless he determines that sufficient new information is available to warrant such proposal.
 
 
 [7]
 16 U.S.C. Sec. 1533(b)(6)(B)(iii) provides:
 If the one-year period specified in subparagraph (A) is extended under clause (i) with respect to a proposed regulation, then before the close of such extended period the Secretary shall publish in the Federal Register either a final regulation to implement the determination or revision concerned, a finding that the revision should not be made, or a notice of withdrawal of the regulation under clause (ii), together with the finding on which the withdrawal is based.
 
 
 [8]
 16 U.S.C. Sec. 1540(g) provides:
 (1) Except as provided in paragraph (2) of this subsection any person may commence a civil suit on his own behalf-- ...
 (C) against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary with the Secretary.
 
 
 [9]
 An excerpt indicates the extent to which FWS relied on the USGS study in discussing the primary threat to the Springs Snail:
 Beginning in the late 1890's, when ground water development for domestic and agricultural purposes began in the Bruneau area, through 1991, an estimated 275,000 acre-feet of thermal water was discharged from Indian Bathtub Spring (Berenbrock, USGS, written communication). Of this amount, only 1,400 acre-feet was discharged from the spring during 1981 to 1991. The decline in discharge from the Indian Bathtub springs was noted beginning in the mid-1960's and coincided with the accelerated increase in ground water withdrawal associated with a rapid increase in the amount of lands irrigated with ground water throughout the Bruneau area. As recently as 1991, the USGS estimated that ground water withdrawals exceeded the estimated historic rate of natural recharge by about 12,000 acre-feet (Berenbrock, USGS, written communication).
 
 
 [58]
 Fed.Reg. at 5943