**JEWISH COMMUNITY ACTION,**
**et al., Petitioners,**

**National Lawyers Guild—Minnesota**
**Chapter, et al., Petitioners,**

v.

**COMMISSIONER OF PUBLIC**
**SAFETY, Respondent.**

Nos. CX–02–1214, C4–02–1290.

Court of Appeals of Minnesota.

March 11, 2003.

Todd A. Noteboom, Daniel L. Palmquist, Timothy P. Griffin, Mical R. Kapsner, Leonard, Street and Deinard, Minneapolis, MN, for petitioners Jewish Community Action, et al.

Jordan S. Kushner, Minneapolis, MN, and Peter James Nickitas, St. Paul, MN, for petitioners National Lawyers Guild—Minnesota Chapter, et al.

Mike Hatch, Attorney General, Melissa J. Eberhart, Omar A. Syed, Assistant Attorneys General, St. Paul, MN, for respondent.

Teresa Jo Nelson, St. Paul, MN, for Minnesota Civil Liberties Union.

Eric Lipman, State Representative, Minneapolis, MN, for amicus curiae legislators.

Steven L. Theesfeld, Yost and Baill, LLP, Minneapolis, MN, for amicus curiae Minnesotans for Immigration Reform.

Considered and decided by MINGE, Presiding Judge, SHUMAKER, Judge, and HALBROOKS, Judge.

## OPINION

GORDON W. SHUMAKER, Judge.

This is a pre-enforcement declaratory-judgment action over which this court has original jurisdiction under Minn.Stat. § 14.44 (2002). The petitioners seek judgment declaring invalid certain department of public safety rules pertaining to proof of identity for the issuance of drivers' licenses and state identification cards. The petitioners contend that the department exceeded its authority in promulgating the rules, failed to comply with statutory rulemaking requirements, and violated state and federal constitutions.

## FACTS

In January 2002, the Minnesota Department of Public Safety (DPS) issued a request for comment on a possible rule that would require applicants for Minnesota drivers' licenses or state identity cards to prove lawful presence in the United States and would link the period of validity of a short-term resident alien's license to the term of his or her visa. Because an anti-terrorism bill introduced in the legislature shortly thereafter included similar measures, the DPS postponed rulemaking to await the outcome of the legislative process. The bill passed in May 2002, without the driver's-license provisions.

In June 2002, shortly after the legislative session concluded, the DPS adopted new rules, amended an existing rule, and repealed a rule, all governing proof of identity for the issuance of drivers' licenses, drivers' permits, state identification cards, and motor-vehicle title certificates or registrations (collectively, license or licenses). Amended Minn. R. 7410.0400 provides that an applicant for a license who cannot prove identity through a previously issued Minnesota license must present a "primary document," such as an official record of birth, an adoption certificate, a listed federally issued identification card, a passport, or a listed immigration document. In addition to the "primary document," the applicant must present a "secondary document," which could be an additional primary document; a foreign driver's license, permit, or identification card with photographic or digitized images; certain birth records; or certain school records.

Minn. R. 7410.0410, a new rule, requires license applicants to prove Minnesota residency and either U.S. citizenship or lawful short-term, indefinite, or permanent presence in the United States. The rule specifies the documents acceptable as proof of residency and lawful presence.

Minn. R. 7410.1810, also a new rule, requires that a license contain a full-face image of the license-holder, with head and face unobscured and uncovered. Headcoverings are allowed only in the case of applicants suffering from illness or disease-related hair loss. In adopting this rule, the DPS also repealed Minn. R. 7410.1800, which provided an exception to the photograph requirement for applicants who opposed being photographed on religious grounds.

State agencies, such as the DPS, have statutory authority to adopt, amend, or repeal their rules, but, subject to excep-

tions, the agencies must follow the procedures designated in Minn.Stat. §§ 14.001 to 14.69. Minn.Stat. § 14.05 (2002). Those procedures include (1) public review of the agency's statement of the need for and reasonableness of the rule, Minn.Stat. § 14.131, and (2) an opportunity for a public hearing on the proposed rule, Minn. Stat. § 14.25.

An agency may adopt, amend, or repeal a rule without following the usual rulemaking requirements if there is "good cause" to do so. This exception applies if the agency finds the usual requirements "unnecessary, impracticable, or contrary to public interest" and the rule addresses "a serious and immediate threat to the public health, safety, or welfare." Minn.Stat. § 14.388 (2002). When the DPS amended rule 7410.0400, adopted rules 7410.0410 and .1810, and repealed rule 7410.1800, it invoked the "good-cause exception" and did not submit the matter for public review. Instead, as required by statute, the DPS submitted its findings of fact, supporting reasons, and supporting documents to the Minnesota Office of Administrative Hearings for review.

The DPS characterized licenses as "gateway documents," which enable holders to establish ostensibly accurate and legitimate identities and to gain privileges available only to people who can identify themselves through widely accepted official documentation. With such gateway documents, terrorists can blend into society without raising suspicion and can prepare sabotage schemes from the inside. The DPS determined that the rule changes will reduce fraud in license applications and will make it difficult for undocumented aliens to obtain or to continue to hold licenses. Drawing principally on media reports of terrorist activities and threats, the DPS further determined that public rulemaking would have been contrary to

the public interest because of the urgency of dealing with the threat of terrorism.

An administrative law judge (ALJ) reviewed the DPS's submissions; found that the DPS failed to show an immediate, serious threat to public safety or that the ordinary rulemaking process would be contrary to the public interest; and disapproved the rules. The ALJ noted that the DPS had demonstrated the "very real" threat of terrorism nationally, but "the immediacy of the threat, insofar as it can be addressed through drivers' licenses, has not been shown."

The DPS then requested review by the chief administrative law judge under Minn. R. 1400.2400, subp. 5 (2001), and provided additional evidence of the national threat of terrorism and the opinion of certain federal officials that further attacks in the United States are inevitable. The chief ALJ concluded that the proposed rules were "a proper use of the Good Cause exemption" and approved them, with modifications not at issue here. The rules took effect on July 12, 2002, and are valid for two years. Minn.Stat. § 14.388 (2000).

Petitioners challenge these rules. They also challenge two additional changes to internal DPS license-issuance policy. The first provides that licenses issued to temporary residents must contain the phrase "status check" and the expiration dates of the residents' visas. The second provides that the DPS will automatically cancel the license of any temporary resident who does not inform the DPS of a visa renewal or extension prior to the status-check date. Because the additional changes were not included in the final rules as promulgated, they may be not be challenged in a pre-enforcement action under Minn.Stat. § 14.44. *Minn. Ass'n of Homes for the Aging v. Dep't of Human Servs.*, 385 N.W.2d 65, 69 (Minn.App.1986), *review denied* (Minn. June 13, 1986).

## ISSUES

1. What is the standard governing appellate review of an agency's finding of "good cause" to engage in exempt rulemaking?

2. Did the DPS satisfy the requirements governing good-cause exempt rulemaking?

## ANALYSIS

The validity of an administrative rule may be challenged through a petition for declaratory judgment addressed to this court if the rule allegedly would interfere with or impair the petitioner's legal rights or privileges. Minn.Stat. § 14.44 (2002). This court

shall declare the rule invalid if it finds that it violates constitutional provisions or exceeds the statutory authority of the agency or was adopted without compliance with statutory rulemaking procedures.

Minn.Stat. § 14.45 (2002).

Although petitioners challenge the rules on all three grounds provided in section 14.45, the issue of compliance with statutory rulemaking procedures is dispositive, and we need not address the other grounds.

*Standard of Review*

■■■ Because the appellate courts of this state have not previously been asked to review an agency's findings of good cause to engage in exempt rulemaking, the question of the standard of review to be applied is one of first impression. We turn to federal law for guidance. Under the federal administrative-procedure act, the existence of good cause to engage in exempt rulemaking is an issue of law.

*Washington State Farm Bureau v. Marshall,* 625 F.2d 296, 306 (9th Cir.1980); *Ohio State Consumer Educ. Ass'n v. Schweiker,* 541 F.Supp. 915, 919 n. 2 (D.C.Ohio 1982). Like Minnesota law, the federal statute permits a good-cause exemption when public rulemaking is impracticable, unnecessary, or contrary to public interest.[1] We find no basis for treating Minnesota's good-cause exemption differently from the federal approach; thus, we hold that the existence of good cause for purposes of exempt rulemaking under Minnesota administrative law is a question of law. This court reviews an agency's conclusions of law de novo. *St. Otto's Home v. Minn. Dep't of Human Servs.,* 437 N.W.2d 35, 39–40 (Minn.1989) (requiring de novo review of agency decision involving questions of law).

*Existence of Good Cause*

The DPS found that there was good cause to engage in exempt rulemaking. In the context of this case, the existence of good cause depends on a showing (1) that there is a serious and immediate threat to public health, safety, or welfare; (2) that the rules address that threat; and (3) that it would be contrary to the public interest to follow usual rulemaking procedures. *See* Minn.Stat. § 14.388 (2002).

*Serious and Immediate Threat*

■■■ The seriousness of the threat of terrorism to life, liberty, or property is beyond dispute. The September 11, 2001, terrorist attacks on the World Trade Center in New York and the Pentagon in Washington, D.C., are chilling evidence of the palpable gravity of the threat that the DPS seeks to address. The intelligence information on which the DPS relied in its

---

**1.** *See* 5 U.S.C. 553(b)(B) (2000) (exempting rulemaking from notice and comment requirements "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest").

findings—some of which included communications intercepted from terrorist networks—portend additional attacks at any time and anywhere throughout the United States. The ALJ questioned the DPS's showing of immediacy of the threat or its particular links to Minnesota. Realistically, effective terrorism, such as that carried out on September 11, is clandestine and surreptitious, and its perpetrators will unquestionably conceal locations and timing of attacks until they are launched. Thus, better evidence of the immediacy and locations of future attacks than that supplied by the DPS is likely not readily obtainable before the fact. We hold that the DPS sufficiently demonstrated both the seriousness and the immediacy of the threat of harm the rules purportedly address.

### Focus of the Rules

■ The DPS determined that the rules will "tighten homeland security in Minnesota," noting that some of the terrorist activity in the United States is carried out by foreign nationals and that many foreign nationals are illegally present in this country. Because even people not entitled to be in the United States can usually obtain or retain licenses, they can appear to be lawfully present and can plan nefarious activities without easy detection:

> The September 11th hijackers were described as initially entering the country, some through fraudulent means, establishing an identity through state-issued documents and blending into society in order to plan their attack.

According to the DPS, the new rules will close an identification loophole that has made identification fraud and identity theft possible.

The DPS has not demonstrated a particularly strong link between license regulation and the perpetration of terrorist crimes. But unarguably a critical key to the prevention and detection of crime is the ready and accurate identification of criminals. Law enforcement nationwide devotes considerable resources to identification through fingerprint, voice, and DNA analysis; blood-type matching; and comparable procedures. The new rules, aimed at fostering accurate identification of all license holders—citizens and permanent and temporary residents alike—address the problem of protecting the safety and welfare of people in Minnesota. We hold that the rules are generally tailored to address a problem of public safety; but, because of our analysis in the following section, we do not further reach the question of the substantive propriety of the rules to deal with threats of terrorism.

### Contrary to Public Interest

■ The third factor is whether following usual rulemaking procedures would be contrary to the public interest. In his order approving the rules as modified, the chief ALJ highlighted the significance of the ordinary rulemaking process:

> Removing rules from the normal process precludes notice to the public and any opportunity for the affected members of the public to comment on the potential impacts of the proposed rule. This is a significant intrusion into the rights of the public and increases the risk of unanticipated adverse consequences arising from application of the rule.

The DPS contended that the contrary-to-public-interest factor "requires inquiry into whether delay occasioned by public participation in rulemaking would seriously injure important public interests." It then argued that "Minnesota must produce a recognizably reliable source of identification" in issuing licenses to "reduce exposure to identity theft and fraud" and "to protect the integrity of Minnesota" licenses.

The chief ALJ concluded that federal security alerts of ongoing threats and the desire of the federal Office of Homeland Security "to establish tighter control over foreign visitors" through license changes do not justify exempt rulemaking. But the DPS produced evidence of hundreds of license applicants whose federal admission documents were "due to expire within days of the application" and evidence of "a significant number of individuals using fraudulently obtained identifications." The chief ALJ noted that, although there is no link between those individuals and the threat addressed by the rules, the DPS

> did present facts showing that, on a nation-wide basis, non-U.S. citizens are seeking to obtain forms of legitimate identification documents as a part of their plan to conduct terrorist operations within the country.

The chief ALJ concluded that current license rules are susceptible to exploitation by persons not entitled to receive licenses and that the DPS "has shown that some of those persons present a risk of harm within the United States." It is this evidence, according to the chief ALJ, that provides "adequate justification that the exempt rule process is needed."

 Exempt rulemaking is an exceptional procedure and is reserved for emergencies. *Buschmann v. Schweiker,* 676 F.2d 352, 357 (9th Cir.1982). It obviates "the opportunity to bring to the agency's attention all relevant aspects of the proposed action and thereby enhance the quality of agency decisions." *Cmty. Nutrition Inst. v. Butz,* 420 F.Supp. 751, 754 (D.D.C.1976). It has a negative impact on the statutory goal of "increas[ing] public accountability of administrative agencies." Minn.Stat. § 14.001(2) (2002). *See U.S. Dep't of Labor v. Kast Metals Corp.,* 744 F.2d 1145, 1152 (5th Cir.1984) (noting that

an administrative agency needs public input to remain informed).

The ALJ who originally considered the rules noted some of the significant concerns in bypassing the full rulemaking process:

> As to the substance of the rule, the commentors assert that a full rulemaking process should consider whether or not * * * the commissioner has statutory authority to address immigration issues through licensing of drivers, whether or not the rule conflicts with the four-year license period in statute, and whether or not there are equal protection problems in the rule's treatment of immigrants.
>
> An exempt rule record is inadequate to make a decision on issues such as these.

The record before us is more conclusory than factual on the contrary-to-public-interest standard. The DPS simply asserts that delays in implementing the rules would be inimical to the public safety. The DPS has not quantified the delay; thus, we do not know whether it is a matter of weeks, months, or years. Obviously, even the DPS believed that some delay is tolerable because it initially sought to adopt the rules through the lengthier public process and then suspended its rulemaking efforts during the 2002 legislative session to await the outcome of the governor's anti-terrorism bill. Even though the DPS was undoubtedly proceeding in good faith to avoid unnecessary duplication and potential conflicts in rules and statutes, its action evinces its belief that the formal rulemaking process, with public participation, could be adequate to address the problem.

To satisfy the contrary-to-public-interest factor, the DPS must reasonably quantify the delay that will occur if formal rulemaking is undertaken; show with reasonable

particularity how the public interest will likely be harmed by that delay; and demonstrate specifically how the exempt rulemaking procedure will better serve the public interest. We hold that the DPS has failed to carry its procedural burden as to the contrary-to-public-interest requisite, and, therefore, has failed to show good cause for exempt rulemaking. Thus, solely on procedural grounds, we declare rules 7410.0410, .1800, and .1810 to be invalid.

## DECISION

The exempt rules address a threat to public safety that arguably might be both serious and immediate. But because the DPS has not demonstrated with reasonable particularity how rulemaking through public procedures would have harmed the public interest, the statutory requirements governing good-cause exempt rulemaking have not been satisfied.

**Rules declared invalid.**

MINGE, Judge, (concurring specially).

I concur in this opinion with one exception. I would not reach the question of whether the DPS has sufficiently demonstrated the seriousness and immediacy of the threat of harm to support the rules in question. Since this decision invalidates the rules, this statement on seriousness and immediacy is dicta and that determination should be left to the DPS, the legislature and any subsequent court consideration of possible replacement rules. Certainly all of us, including appellate judges, agree that our nation faces threats from terrorists. The tragedy of the September 11, 2001, airplane hijackings and crashes are a grim reminder that we cannot be complacent. However, at the same time we are keenly aware that some past claims of seriousness and immediacy have been used to justify policies which in retrospect have been discredited. *Compare*

*Korematsu v. U.S.,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944) (finding constitutional the internment of Japanese–Americans during the second world war) *with Civil Liberties Act of 1988,* Pub.L. No. 100–383, 102 Stat. 903 (apologizing for the internment of Japanese–Americans and making restitution to internment survivors).